184 P.3d 769

HAWAII INSURERS COUNCIL,
Plaintiff–Appellee,

v.

Linda LINGLE, Governor, State of Hawaii; Georgina K. Kawamura, Director of Finance, Department of Budget and Finance; Lawrence M. Reifurth, Director, Department of Commerce and Consumer Affairs [1]; J.P. Schmidt, Insurance Commissioner, Insurance Division, Department of Commerce and Consumer Affairs, Defendants–Appellants.

No. 27840.

Intermediate Court of Appeals of Hawai'i.

April 14, 2008.

As Amended April 15, 2008.

1. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1), Lawrence M. Reifurth, the current Director of the Department of Commerce and Consumer Affairs, has been substituted for Mark E. Recktenwald, the Director at the time the case was decided by the circuit court.

Kimberly Tsumoto Guidry, Deputy Solicitor General (James F. Nagle, Deputy Attorney General, with her on the briefs), for Defendants–Appellants.

Lisa Woods Munger (Gary M. Slovin and Donna H. Kalama with her on the brief)

(Goodsill Anderson Quinn & Stifel), Honolulu, for Plaintiff–Appellee.

FOLEY and FUJISE, JJ.; and WATANABE, Presiding Judge, concurring separately.

Opinion of the Court by FOLEY, J.

Defendants–Appellants Linda Lingle, Governor of the State of Hawai'i; Georgina K. Kawamura, Director of Finance, Department of Budget and Finance; Lawrence M. Reifurth, Director of the Department of Commerce and Consumer Affairs (DCCA); and J.P. Schmidt, Insurance Commissioner, Insurance Division of the DCCA (collectively referred to as "the State") appeal from the Final Judgment entered on February 27, 2006 in the Circuit Court of the First Circuit[2] (circuit court).

On appeal, the State argues that the circuit court erred

(1) in ruling that, under *State v. Medeiros*, 89 Hawai'i 361, 973 P.2d 736 (1999), the assessments were taxes rather than regulatory fees;

(2) in ruling that the assessments violated the Due Process Clauses of the United States and Hawai'i Constitutions;

(3) in ruling that the assessments violated separation of powers;

(4) in ruling that the assessments violated the Equal Protection Clauses of the United States and Hawai'i Constitutions;

(5) in ruling that the assessments violated Hawaii Revised Statutes (HRS) § 431:7–204 (2005 Repl.);

(6) in granting the request of Plaintiff–Appellant Hawaii Insurers Council (HIC) for injunctive relief;

(7) in granting HIC an accounting;

(8) in rejecting the State's defense that HIC failed to exhaust its administrative remedies; and

(9) in rejecting the State's defense that HIC cannot pursue a declaratory action involving a tax matter.

## I.

On September 27, 2002, HIC filed a Complaint in the circuit court. The Complaint contained six counts: Count I, statutory scheme; Count II, illegal transfer; Count III, due process; Count IV, separation of powers; Count V, equal protection; and Count VI, accounting.

On October 25, 2002, HIC moved for a preliminary injunction to prevent the transfer of $2,000,000 from the cash balance in the Insurance Regulation Fund (IRF) to the State of Hawai'i General Fund. The circuit court heard the motion on November 19, 2002. On November 25, 2002, the circuit court entered its findings of fact, conclusions of law, and order denying HIC's motion for a preliminary injunction.

On November 27, 2002, HIC filed an Emergency Motion for Injunction Pending Appeal. The circuit court heard the motion on November 29, 2002, orally denied it at the hearing, and filed its written order on December 9, 2002.

After conducting discovery, HIC filed a First Amended Complaint on January 12, 2005, asserting nine counts: Count I, unconstitutional tax; Count II, statutory scheme; Count III, illegal transfer; Count IV, due process; Count V, separation of powers; Count VI, equal protection; Count VII, violation of HRS § 431:7–204; Count VIII, violation of trust doctrine; and Count IX, accounting. HIC alleged:

(1) In 1999, HRS § 431:2–215 established the IRF[3]; under HRS § 431:2–215(d), the

---

2. The Honorable Karen S.S. Ahn presided.

3. HRS § 431:2–215 was revised in 2000, 2002, 2005, and 2006. In 1999, HRS § 431:2–215(a) provided that "[a]ll assessments, fees, fines, penalties and reimbursements collected by or on behalf of the insurance division under title 24, except for [particular exceptions], shall be deposited into the insurance regulation fund." The

purpose of the fund was to allow the Insurance Division of the DCCA to "become administratively self-sufficient." Hse. Stand. Comm. Rep. No. 1431, in 1999 House Journal, at 1587 (S.B. No. 1129).

In 1999, HRS § 431:2–215(d)(3) specified that assessments must "bear a reasonable relationship to the costs of regulating the line or type of

Insurance Commissioner determined the amounts to be assessed against the insurers for payment into the IRF; and the assessed amounts were to be used "to support the operations of the Insurance Division and to enable the Insurance Commissioner to administer Title 24 of the Insurance Code." HRS § 431:7–203(a) (1993 & Supp.1999) provided that excess contributions to the IRF be returned to the paying insurers.[4]

(2) For the fiscal year 2001–02, the Insurance Commissioner decided to increase the assessments to create a substantial cash reserve known as a "reserve margin."

(3) The insurers have been assessed amounts to cover the overhead of the (a) Insurance Division, (b) DCCA, and (c) Department of Budget and Finance.

(4) On April 30, 2002, the legislature passed H.B. No. 2827 (Act 178), determining that there existed an excess of $4,000,000 in the IRF and authorizing the Director of Finance to transfer $2,000,000 from the IRF to the General Fund on July 1, 2002, and another $2,000,000 on December 1, 2002. On June 20, 2002, then-Governor Cayetano vetoed only the July 1, 2002 transfer.

(5) On April 23, 2002, Governor Cayetano signed into law S.B. 2723 (Act 39), which merged the IRF with the Compliance Resolution Fund. The legislature's intent in passing Act 39 was not to make substantive changes to the procedures or limitation of HRS § 431:2–215, but to merge the IRF into the Compliance Resolution Fund to provide "greater efficiency in the administration of departmental funds." Pursuant to Act 39,

the unencumbered balances existing in the IRF as of June 30, 2002, were deposited into the insurance sub-account of the Compliance Resolution Fund.

(6) In 2003, the legislature authorized the transfer of up to $15,000,000 from the Compliance Resolution Fund to the General Fund. 2003 Haw. Sess. L. Act 178, § 28 at 407. The Director of Finance transferred $1,500,000 from the insurance regulation sub-account of the Compliance Resolution Fund to the General Fund.[5]

(7) Based on HRS § 431:2–215 and related sections, the assessment of a reserve margin, the assessment for multiple departments' overhead, and the transfer of assessments to the General Fund or any other fund violated the Hawai'i and United States Constitutions as the assessments were illegal and unconstitutional taxes.

The State filed an amended motion for summary judgment on January 31, 2005. On February 1, 2005, HIC filed its motion for summary judgment. The circuit court heard the motions on July 11, 2005 and ruled from the bench on July 26, 2005, but did not file its order until February 27, 2006. The circuit court granted the State's motion for summary judgment as to Counts II (statutory scheme), III (illegal transfer), and VIII (violation of trust doctrine). The circuit court stated that it had not considered the "actual transfer of funds from the insurance special fund to the general fund except [sic] counts 2 and 8." The circuit court denied the State's motion as to the State's defenses that HIC

---

**4.** In 1993, HRS § 431:7–203(a) provided in relevant part:

> **§ 431:7–203 Administrative refunds.** (a) In the event any person has paid to the commissioner any tax, fee, or other charge in error or in excess of that which the person is lawfully obligated to pay under this code, the commissioner, upon written request ... shall authorize a refund thereof out of the general funds of this State[.]

In 1999, § 431:7–203, among other HRS sections, was amended by substituting the term "insurance regulation fund" wherever the term "general fund" appeared. 1999 Haw. Sess. L. Act 163, § 15 at 545.

insurance," but also allowed inclusion of "any administrative costs of the [Insurance Division]."

**5.** In 2003, the legislature authorized the Director of Finance to transfer up to $15,000,000 from the Compliance Resolution Fund to the General Fund, but the authorization date of the transfer was not effective until January 1, 2004. 2003 Haw. Sess. L. Act 178, § 28 at 407.

However, in 2002, the legislature had authorized, effective July 1, 2002, the Director of Finance to transfer up to $26,000,000 from the Compliance Resolution Fund to the General Fund. 2002 Haw. Sess. L. Act 178, § 39 at 793. Effective July 1, 2002, the IRF was merged with the Compliance Resolution Fund. On June 30, 2003, the Director of Finance transferred $1,500,000 from the insurance regulation sub-account of the Compliance Resolution Fund to the General Fund.

had failed to exhaust its administrative remedies and that HIC could not pursue a declaratory action involving a tax matter. The circuit court granted HIC's motion for summary judgment as to Counts I (unconstitutional tax), IV (due process), V (separation of powers), VI (equal protection), VII (violation of HRS § 431:7–204), and IX (accounting), and HIC's request for an accounting and injunctive relief.

The State filed a motion on October 17, 2005, asking the circuit court to reconsider its grant of HIC's request for injunctive relief or, in the alternative, to stay the injunction. On January 23, 2006, the circuit court filed an order, in which it denied the State's motion for reconsideration of the grant of injunctive relief, but granted the motion for stay, subject to certain conditions.

On February 27, 2006, the circuit court entered its Final Judgment. On March 28, 2006, the State timely filed its notice of appeal.

## II.

### A. Summary Judgment

"We review the circuit court's grant or denial of summary judgment de novo." *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)). The Hawai'i Supreme Court has often articulated that

summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin*, 107 Hawai'i at 56, 109 P.3d at 697 (quoting *Durette*, 105 Hawai'i at 501, 100 P.3d at 71).

▮ Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e) provides in relevant part:

**Rule 56. Summary judgment.**

. . . .

*(e) Form of affidavits; further testimony; defense required.* . . . When a motion for summary judgment is made . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Thus, "[a] party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, 'nor is [the party] entitled to a trial on the basis of a hope that [the party] can produce some evidence at that time.'" *Henderson v. Prof'l Coatings Corp.*, 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2727 (1983)).

### B. Constitutional Questions

▮ The appellate court answers questions of constitutional law by exercising the court's own independent judgment based on the facts of the case; thus, it reviews questions of constitutional law under the right/ wrong standard. *County of Kaua'i v. Baptiste*, 115 Hawai'i 15, 25, 165 P.3d 916, 926 (2007).

Where it is alleged that the legislature has acted unconstitutionally, the Hawai'i Supreme Court has long held that "(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Convention Ctr. Auth. v. Anzai*, 78 Hawai'i 157, 162, 890

P.2d 1197, 1202 (1995) (internal quotation marks, citation, and brackets omitted).

### III.

### A. Assessments Were an Illegal Tax

■ The State argues that the circuit court erred by applying the test set forth in *Medeiros* in determining that the assessments levied by the Insurance Division were illegal taxes and not permissible regulatory fees. The State argues that the test, as set forth in *San Juan Cellular Telephone Co. v. Public Service Commission of Puerto Rico*, 967 F.2d 683 (1st Cir.1992), should apply to situations such as this, where the assessment imposed is more like a regulatory fee than a user fee. We disagree and hold that the circuit court did not err in applying the test set forth in *Medeiros* and in holding that the assessments were invalid.

■ We first determine the nature of and authority for the assessments levied by the Insurance Division. Article VIII, § 3 of the Hawai'i Constitution states:

> **Section 3.** The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties.... The legislature shall have the power to apportion state revenues among the several political subdivisions.

The term "political subdivisions" as it appears in the section refers to counties. Stand. Comm. Rep. No. 53, Committee on Local Government, 1 *Proceedings of the Constitutional Convention of Hawaii of 1968*, at 229 (1973). Such a definition excludes agencies of the executive branch of state government.

> The power of taxation is essentially a legislative power. It cannot be delegated except to municipalities which themselves exercise subordinate legislative powers. The power to tax must not be confused with the administrative duties which are necessarily involved in the assessment and collection of taxes. In the nature of things, the legislature itself cannot attend

to all the details involved in the enforcement of the law. Those must of necessity be entrusted to administrative officers. But the tax can be imposed only by the legislative power. No arbitrary discretion to fix the rate of a tax, or to determine the method by which it is to be levied, or to adjust its apportionment among the taxpayers, where the principles upon which the apportionment is to be made are not fixed, can be left to the executive branch of the government.

*McCandless v. Campbell*, 20 Haw. 411, 420 (1911).

Therefore, in the instant case, if the assessments imposed on insurers are a tax, they are an unconstitutional delegation of the State of Hawai'i's taxing power to the executive branch. If the assessments are fees, they are permissible by exercise of the "police power to regulate particular businesses or activities." *Medeiros*, 89 Hawai'i at 366, 973 P.2d at 741 (quoting *Nat'l Cable Tel. Ass'n v. United States*, 415 U.S. 336, 341, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974)).

In *Medeiros*, the Director of Finance and the Prosecutor for the City and County of Honolulu (collectively, City) appealed from a circuit court order enjoining the City from implementing or enforcing a city ordinance that imposed a $250 service fee on each convicted criminal defendant "for services performed by the [C]ity in connection with the arrest, processing, investigation, and prosecution of the convicted person." 89 Hawai'i at 362, 973 P.2d at 737. In holding that the ordinance imposed an invalid tax on Medeiros, the Hawai'i Supreme Court adopted a three-prong test for determining whether a charge is a fee or a tax. *Id.* at 367 & 370, 973 P.2d at 742 & 745. The court analyzed "whether the charge (1) applies to the direct beneficiary of a particular service, (2) is allocated directly to defraying the costs of providing the service, and (3) is reasonably proportionate to the benefit received." 89 Hawai'i at 367, 973 P.2d at 742.

The assessments levied pursuant to HRS § 431:2–215 do not survive scrutiny under the first prong of *Medeiros* because the regulation of the insurance industry directly ben-

efits the public-at-large—not the insurers who pay the assessments. States regulate the insurance industry for the public good. *California State Auto. Ass'n Inter–Ins. Bureau v. Maloney*, 341 U.S. 105, 109, 71 S.Ct. 601, 603, 95 L.Ed. 788 (1951). "Inasmuch as the public at large is the primary beneficiary, and the [insurers] themselves are, if anything, only incidental beneficiaries" of the regulation of the insurance industry, the assessments are invalid taxes and not fees under the first prong of the *Medeiros* test. *Medeiros*, 89 Hawai'i at 370, 973 P.2d at 745.

The case before us is distinguishable from *In re Water Use Permit Applications*, 94 Hawai'i 97, 183–85, 9 P.3d 409, 495–97 (2000), in which the Hawai'i Supreme Court rejected the argument, raised by various leeward O'ahu water permittees, that it was unfair to require the permittees to pay for water use studies that primarily benefitted users on the windward side of the island because those studies did not directly benefit the leeward permittees in a manner "not shared by other members of a society." 94 Hawai'i at 185, 9 P.3d at 497 (quoting *Medeiros*, 89 Hawai'i at 366, 973 P.2d at 741). The Hawai'i Supreme Court, applying *Medeiros*, rejected that argument, noting that the studies funded by the assessments related directly to the permittees' burden of proving their water uses were a "reasonable-beneficial" use and "consistent with the public interest" and ultimately concluded that it was not "unfair to require the permittees to provide a reasonable share of the costs." *In re Water Use Permit Applications*, 94 Hawai'i at 185, 9 P.3d at 497.

In the instant case, the assessments also fail to survive scrutiny under the second and third prongs of *Medeiros* in that the assessments are not allocated directly to defraying the costs of providing services to the insurers and are not reasonably proportionate to benefits received by the insurers. Assuming arguendo that HRS § 431:2–215 (establishing the IRF), § 431:2–215(d) (authorizing the Insurance Commissioner to assess against insurers amounts to be paid into the IRF), and

§ 431:7–203(a) (providing that excess payments by insurers to the IRF be refunded) on their face do not run afoul of the second and third prongs of *Medeiros*, they do as applied in this case.

In 2002, the legislature determined there existed an excess of $4,000,000 in the IRF and authorized this amount to be transferred to the General Fund. Governor Cayetano vetoed the July 1, 2002 transfer of $2,000,000 to the General Fund; however, he approved the December 1, 2002 transfer of $2,000,000, and these funds were subsequently transferred. In 2003, an additional $1,500,000 was transferred from the IRF (which had been merged with the Compliance Resolution Fund) to the General Fund.[6] Even without examining HIC's contentions that assessments were used to fund operations of the executive branch other than regulating insurers, it is clear that assessment funds of insurers transferred from the IRF to the General Fund were not allocated directly to defraying the costs of providing services to the insurers and were not reasonably proportionate to benefits received by the insurers—as set forth in the second and third prongs of *Medeiros*. Had the assessments borne "a *reasonable* relationship to the cost of the services rendered" by the Insurance Division, there would not have been millions of dollars in excess assessments available for transfer to the General Fund. *In re Water Use Permit Applications*, 94 Hawai'i at 186, 9 P.3d at 498 (internal quotation marks and citation omitted).

Had the excess payments by insurers been refunded as provided by HRS § 431:7–203(a) rather than transferred to the General Fund, then the State would have been in a better position to argue the assessments were not invalid taxes under the second and third prongs of the *Medeiros* test. Any amount of the assessments expended by the executive branch for purposes other than regulating insurers still would undermine the State's position. It appears a substantial amount of the assessments went to creating a reserve margin within the IRF and to covering the

6. HIC's First Amended Complaint alleged that property and casualty insurers, including HIC members, were assessed $2,981,738 in 1999,

$2,197,866 in 2000, $5,763,541 in 2001, and $4,661,395 in 2002.

general overhead of not only the Insurance Division, but the DCCA and the Department of Budget and Finance. This is a further departure from compliance with the *Medeiros* test.

*Medeiros* precludes us from applying the test set forth in *San Juan Cellular*, as urged by the State. In *San Juan Cellular*, the United States Court of Appeals for the First Circuit considered a charge imposed by the Puerto Rican government on a private telecom company. 967 F.2d at 684. The First Circuit, in its analysis of whether the charge imposed was an illegal tax or a valid regulatory fee, noted that a tax is "imposed by a legislature upon many, or all, citizens" and "raises money, contribute[s] to a general fund, and [is] spent for the benefit of the entire community," where a regulatory fee "may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." 967 F.2d at 685 (citations omitted).

The State argues that whereas *Medeiros* concerned a user fee imposed on particular individuals as a way to defray the cost of specific expenditures, the *San Juan Cellular* test is a much better fit for the instant case because this case concerns a regulatory fee imposed on an entire industry for purposes of defraying the costs of regulating that industry. The State contends that under *San Juan Cellular*, 967 F.2d at 685–86, the assessment would be a valid regulatory fee and not an illegal tax because the fee is assessed by a regulatory agency, the money is placed in a special fund, and those funds are not used for a general purpose, but are intended to defray the costs associated with regulation of the insurance industry.

We apply Hawai'i law as set forth by the supreme court of this State. *Medeiros* is the law in Hawai'i, and it is binding on us. The test set forth in *Medeiros* makes no distinction between regulatory and user fees, but only between fees and taxes. The assessments against the insurers do not survive scrutiny under *Medeiros*.

## B. Separation of Powers

The State contends the assessments did not violate the separation of powers doctrine by impermissibly delegating the State's taxation authority to an agency of the Executive branch because the assessments are regulatory fees and the sudden transfer of the fees to the General Fund did not convert the assessments to taxes. HIC, in response, argues that the power to tax is not constitutionally granted to the Executive branch and is not incidental to the performance of the Insurance Division's duties and, therefore, the assessments are unconstitutional.

Generally, the legislature may not delegate its duties to another branch of government. *Loving v. United States*, 517 U.S. 748, 758, 116 S.Ct. 1737, 1744, 135 L.Ed.2d 36 (1996). However, Article VIII, § 3 of the Hawai'i Constitution does provide that the legislature may delegate taxing powers to the counties. As HIC notes: "[A] department ... may not exercise powers not so constitutionally granted, which from their essential nature, do not fall within its division of governmental functions, unless such powers are properly incidental to the performance by it of 'its own appropriate functions.' *Biscoe v. Tanaka*, 76 Hawai'i 380, 383, 878 P.2d 719, 722 (1994)." While the Insurance Commissioner has the authority to assess against insurers fees consistent with the test set forth in *Medeiros*, the Commissioner does not have any taxing powers. *See In re Water Use Permit Applications*, 94 Hawai'i at 185, 9 P.3d at 497. Because the assessments are invalid taxes, the circuit court did not err in granting HIC's motion for summary judgment on separation of powers grounds.

## C. Equal Protection

The State argues that the circuit court erred in ruling that the assessments exposed insurers to an additional "general tax" not collected from others similarly situated and therefore violated the equal protection clauses of the Hawai'i and United States Constitutions.

[A] party challenging the constitutionality of a statutory classification on equal pro-

tection grounds has the burden of showing, with convincing clarity that the classification is not rationally related to the statutory purpose, or that the challenged classification does not rest upon some ground of difference having a fair and substantial relation to the object of the legislation, and is therefore not arbitrary and capricious.

*KNG Corp. v. Kim*, 107 Hawai'i 73, 82, 110 P.3d 397, 406 (2005) (emphasis omitted) (quoting *Sandy Beach Def. Fund v. City Council of City and County of Honolulu*, 70 Haw. 361, 380, 773 P.2d 250, 262 (1989)). HIC argues that "there is no apparent or stated basis for the classification used in HRS § 431:2–215." The State asserts that the "regulatory fees authorized by § 431:2–215 are rationally related to the statutory objective of 'defray[ing] any administrative costs' and 'costs incurred by supporting offices and divisions.' Haw.Rev.Stat. § 431:2–215(b)." We agree with the State on this point. HIC bears the burden on this issue and falls far short of demonstrating the lack of any rational basis for the classification. The circuit court erred in concluding that the assessments violated the equal protection clauses of the Hawai'i and United States Constitutions. However, given our conclusion that the assessments were invalid, this error is harmless.

## D. Due Process

The State asserts that the assessments did not violate the due process clauses of the Hawai'i and United States Constitutions. HIC contends that the procedural due process rights of its members were violated because the assessments represented a new and unlawful tax. HIC also claims a violation of its members' substantive due process rights in that there is no rational basis for its application. As we have concluded that the assessments imposed by the Insurance Commissioner were invalid taxes, we choose not to address this point.

## E. HRS § 431:7–204

■ The State argues that the assessments did not violate the "in lieu" provision of HRS § 431:7–204, which provides:

§ 431:7–204. **In lieu provision.** As to insurers, the taxes and fees imposed by section 431:7–201 to section 431:7–204, and the fees imposed by this code, when paid shall be in settlement of and in lieu of all demands for taxes, licenses, or fees of every character imposed by the laws of this State, the ordinances or other laws, rules, or regulations of any county of this State, except:

(1) As expressly otherwise provided[.]

Since the challenged assessments were invalid taxes, they were not validly imposed pursuant to HRS § 431:2–215. Therefore, the circuit court did not err in concluding that the assessments violated the "in lieu" provision of HRS § 431:7–204.

## F. Circuit Court Jurisdiction

■ The State argues that the circuit court lacked jurisdiction because HIC failed to exhaust its administrative remedies before filing suit. The State cites to HRS § 431:7–203(a) (2005 Repl.), which provides:

§ 431:7–203 **Administrative Refunds.** (a) If any person has paid to the commissioner any tax, fee, or other charge in error or in excess of that which the person is lawfully obligated to pay under this code, the commissioner, upon written request made by the person to the commissioner within the time set forth in section 431:7–204.6, shall authorize a refund thereof out of the compliance resolution fund[.]

Citing to *Pele Defense Fund v. Puna Geothermal Venture*, 9 Haw.App. 143, 151, 827 P.2d 1149, 1154 (1992) (for a remedy to be exhausted, that remedy must first exist), HIC replies that no true administrative remedy existed and therefore exhaustion was an impossibility. We agree with HIC. HRS § 431:7–203(a) did not establish a true available administrative remedy for challenging the constitutionality of the assessments against insurers, and therefore the circuit court did not err in rejecting the State's failure-to-exhaust defense.

■ The State also argues that the circuit court lacks jurisdiction over actions for declaratory relief concerning taxes. The State cites to HRS § 632–1 (1993) and HRCP Rule 57, which exclude tax matters

from the jurisdiction of the state courts of Hawai'i. This argument fails because this case is not "a controversy with respect to taxes" within the meaning of § 632–1 or Rule 57. HRS § 632–1 was amended in 1972 to mirror the exception in the federal Declaratory Judgment Act, 28 U.S.C. § 2201. 1972 Haw. Sess. L. Act 89, § 1 at 338. The federal Declaratory Judgment Act prohibits declaratory relief in tax matters to "permit the government to assess and collect taxes alleged to be due it without judicial interference." *Ingham v. Hubbell*, 462 F.Supp. 59, 64 (S.D.Iowa 1978). The insurers here are not attempting to keep the State of Hawai'i from assessing and collecting taxes. The insurers are challenging assessments of an agency that has no power to impose taxes. The assessments were not valid taxes because the Insurance Commissioner did not have taxing power, but only authority to assess fees consistent with *Medeiros*. The circuit court did not err in concluding that it had jurisdiction.

### G. Sovereign Immunity

The State argues that the doctrine of sovereign immunity bars HIC's claims. Although the State acknowledges that HIC's claims are not tort claims, the State contends that it cannot be held liable for the damages sought by HIC (in the form of an accounting and refund) because the State is not liable for damages arising out of constitutional violations. The State also cites to HRS § 662–15 (Supp.2007) (Exceptions to the Hawai'i State Tort Liability Act), which states in relevant part that "[t]his chapter shall not apply to[ ] ... (2)[a]ny claim arising in respect of the assessment or collection of any tax."

 HIC contends this defense is belated because it is raised for the first time on appeal. Although not raised as a defense in the circuit court, sovereign immunity deprives this court of jurisdiction even if not raised before the trial court. *Marks v. Ah Nee*, 48 Haw. 92, 94–95, 395 P.2d 620, 622 (1964).

 It is settled that "sovereign immunity may not be invoked as a defense by state officials who comprise an executive department of government when their action is attacked as being unconstitutional." *Pele Defense Fund v. Paty*, 73 Haw. 578, 607, 837 P.2d 1247, 1265 (1992) (quoting *W.H. Greenwell, Ltd. v. Dep't of Land & Natural Res.*, 50 Haw. 207, 209, 436 P.2d 527, 528 (1968)). Sovereign immunity does not bar a suit to prevent state officials from acting unconstitutionally. *Paty*, 73 Haw. at 607–08, 837 P.2d at 1265. Sovereign immunity does not bar actions for injunctive relief against State officials to prohibit them from continuing in unconstitutional or illegal behavior. *W.H. Greenwell*, 50 Haw. at 208–09, 436 P.2d at 528.

As to refunds that may be sought by HIC, that question is not before us in this appeal. It was not addressed in the circuit court's summary judgment ruling, and therefore we do not consider the question of whether sovereign immunity would operate to bar a refund of excess assessments levied pursuant to HRS § 431:2–215. We do, however, note that the State has contended on appeal that HIC should have proceeded pursuant to HRS § 431:7–203(a) in pursuing any refund of any tax, fee, or other charge paid to the Insurance Commissioner.

### IV.

Based on the foregoing, we affirm the Final Judgment filed on February 27, 2006 in the Circuit Court of the First Circuit.

Concurring Opinion by WATANABE, Presiding J.

I agree with the majority that the assessments imposed against insurers by the Hawai'i Insurance Commissioner (the Commissioner) pursuant to Hawaii Revised Statutes (HRS) § 431:2–215 are problematic under *McCandless v. Campbell*, 20 Haw. 411 (1911), and *State v. Medeiros*, 89 Hawai'i 361, 973 P.2d 736 (1999). I am also troubled that the amounts of past assessments were apparently determined by the Commissioner without following the rulemaking procedures set forth in the Hawaii Administrative Procedures Act, HRS chapter 91. *See Aguiar v. Hawaii Housing Authority*, 55 Haw. 478, 493, 522 P.2d 1255, 1265 (1974); *Tanaka v.*

*State,* 117 Hawai'i 16, 26, 175 P.3d 126, 136 (App.2007).

I write separately to express my concern about the impact this opinion may have on other specially funded programs and the integrity of the state government's fiscal infrastructure if the test in *Medeiros* is not adjusted. According to a 2001 report by the Auditor of the State of Hawai'i (the Auditor), over 200 special and revolving funds [1] were in existence as of June 30, 2000 and the aggregate cash balance of those funds at the time totaled approximately $1.19 billion. Office of the Auditor, State of Hawai'i, Report No. 01–12, *Update of the 1992 Summary of Special and Revolving Funds* 9 (2001). According to the Auditor, most of these special funds "are designed to be self-sustaining through revenues earmarked from special sources." *Id.* at 1. The Auditor specifically mentions, for example, that the Compliance Resolution Fund (CRF) [2] at issue in this appeal was created "to support the [Department of Commerce and Consumer Affairs'] goal of fiscal self-sufficiency" at a time of "declining general fund support[.]" *Id.* at 12. It is highly probable that other special funds exist which, like the CRF, are comprised of assessments or charges that do not qualify as valid "fees" under the three-pronged test established by the supreme court in *Medeiros.*

1. The Auditor noted in the report that "[i]n governmental accounting, a special fund is defined as 'a fund that must be used in accordance with specific legal or administrative restrictions.'" Office of the Auditor (Auditor), State of Hawai'i, Report No. 01–12, *Update of the 1992 Summary of Special and Revolving Funds* 1 (2001). HRS § 37–52.3 (Supp.2007) currently provides, as it did when this lawsuit was brought:

 **Criteria for the establishment and continuance of special funds.** Special funds shall only be established pursuant to an act of the legislature. The legislature, in establishing or reviewing a special fund to determine whether it should be continued, shall ensure that the special fund:
 (1) Serves the purpose for which it was originally established;
 (2) Reflects a clear nexus between the benefits sought and charges made upon the users or beneficiaries of the program, as opposed to serving primarily as a means to provide the program or users with an automatic means of support that is removed from the normal budget and appropriation process;

In *Medeiros,* the supreme court expressly recognized that

[f]ees imposed by a governmental entity tend to fall into one of two principal categories: user fees, based on the rights of the entity as a proprietor of the instrumentalities used, or regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities.

89 Hawai'i at 366, 973 P.2d at 741 (quoting *Emerson Coll. v. City of Boston,* 391 Mass. 415, 424, 462 N.E.2d 1098, 1105 (1984)). In adopting the three-part test for determining whether a charge constitutes a fee or a tax, however, the supreme court seems to have focused on user fees and overlooked the nature of regulatory fees, which are generally imposed to offset the burdens imposed on the government by the fee-payer, rather than the benefits received by the fee-payer. *See id.* at 366–67, 973 P.2d at 741–42. Other courts examining the issue have adopted a broader test with regard to regulatory fees. *See, e.g., San Juan Cellular Tel. Co. v. Public Serv. Comm'n of Puerto Rico,* 967 F.2d 683 (1st Cir.1992); *Hexom v. Oregon Dep't of Transp.,* 177 F.3d 1134 (9th Cir.1999); *Attorneys' Liab. Assurance Soc'y, Inc. v. Fitzgerald,* 174 F.Supp.2d 619 (W.D.Mich.2001); *Okeson v. City of Seattle,* 150 Wash.2d 540, 78 P.3d 1279 (Wash.2003).

 (3) Provides an appropriate means of financing for the program or activity; and
 (4) Demonstrates the capacity to be financially self-sustaining.
 "Special funds" are defined for budget purposes as "funds which are dedicated or set aside by law for a specified object or purpose, but excluding revolving funds and trust funds." HRS § 37–62 (1993). Pursuant to HRS § 37–32 (Supp.2007), special funds must be appropriated by the legislature and may be expended only after allotment by the director of finance. Additionally, expenditures out of any special fund shall not be made "in excess of the moneys available in the special fund[,]" HRS § 37–52 (1993), and unless otherwise provided by law, every special fund appropriation or part thereof "remaining unexpended and unencumbered at the close of any fiscal year shall lapse and be returned to the general fund in the manner prescribed in section 40–66." HRS § 37–41 (Supp.2007).

2. This appeal involved the Insurance Recovery Fund, which, as the majority notes, merged into the CRF in 2002 and became one of several subfunds of the CRF.

Under the *Medeiros* test, the entire assessment imposed on insurers by the Insurance Commissioner is invalid, not just the excess portion of the assessments in the CRF that the legislature transferred to the state general fund, prompting this lawsuit. *Cf. Bloom v. City of Ft. Collins*, 784 P.2d 304, 311 (Colo.1989) (confirming that a transportation utility fee imposed on owners and occupants of certain property to provide revenues for maintenance of local streets was a special fee and not a property tax subject to a constitutional uniformity requirement, but holding that transfer of excess monies generated by the fee to the general fund rendered the transferred fees an invalid tax). Thus, failure to reexamine *Medeiros* may well have dire consequences on the state government's ability to maintain its fiscal infrastructure and funding mechanisms.