201 P.3d 564

HAWAII INSURERS COUNCIL,
Plaintiff–Appellee,

v.

Linda LINGLE, Governor, State Of Hawai'i; Georgina K. Kawamura, Director of Finance, Department of Budget and Finance; Lawrence M. Reifurth, Director, Department of Commerce and Consumer Affairs; J.P. Schmidt, Insurance Commissioner, Insurance Division, Department of Commerce and Consumer Affairs, Defendants–Appellants.

No. 27840.

Supreme Court of Hawai'i.

Dec. 18, 2008.

**54**

Lisa Woods Munger (Gary M. Slovin and Donna H. Kalama with her on the briefs), Honolulu, for the plaintiff-appellee-respondent Hawaii Insurers Council.

Mark J. Bennett (Kimberly Tsumoto Guidry, Honolulu, and James F. Nagle with him on the briefs), for the defendants-appellants-petitioners Linda Lingle, Georgina K. Kawamura, Lawrence M. Reifurth, and J.P. Schmidt.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

We accepted the application for a writ of certiorari filed by the defendants-appellants-petitioners Linda Lingle, Governor, State of Hawai'i, Georgina K. Kawamura, Director of Finance, Department of Budget and Finance (DBF'), Lawrence M. Reifurth, Director, Department of Commerce and Consumer Affairs (DCCA), and J.P. Schmidt, Insurance Commissioner, Insurance Division, DCCA (collectively, the State) in order to review the published opinion of the Intermediate Court of Appeals (ICA) in *Hawaii Insurers Coun-*

*cil v. Lingle,* 117 Hawai'i 454, 184 P.3d 769 (2008). The ICA affirmed the final judgment of the first circuit court, the Honorable Karen S.S. Ahn presiding, in favor of the plaintiff-appellee-respondent Hawaii Insurers Council (HIC) and against the State. *Id.* at 463, 184 P.3d at 778. In its application, the State asks whether the ICA erred in concluding that the regulatory assessments imposed by the insurance commissioner pursuant to Hawai'i Revised Statutes (HRS) § 431:2–215 (Supp.1999) were unconstitutional taxes and whether the circuit court had subject-matter jurisdiction over this matter.

For the reasons that follow, we hold that the insurance commissioner's assessments were not unconstitutional when they were initially imposed, *see infra* sections III.A and B, but that the legislature's transfer of $3,500,000.00 of those funds into the general fund was unconstitutional under the separation of powers doctrine, *see infra* section III.A. We further hold that the circuit court had subject-matter jurisdiction over this case. *See infra* section III.C. We therefore affirm the ICA's May 5, 2008 judgment in part, reverse it in part, and remand this matter to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

The DCCA is an executive agency of the State of Hawai'i. HRS § 26–4(5) (Supp. 1999). Its departments include an insurance division, HRS § 431:2–101 (1993), which is supervised and controlled by the insurance commissioner, HRS § 431:2–102 (1993 & Supp.2000). In 1999, the DCCA became financially self-sufficient. Its operations were no longer funded by the legislature's general fund, but instead by the persons and entities who were regulated by the DCCA or who received services from the DCCA. To that end, the legislature established the Insurance Regulation Fund (IRF). HRS § 431:2–215(a).[1] "All assessments, fees, fines, penal-

---

1. In 2000 and 2006, HRS § 431:2–215 was amended in respects immaterial to the present matter. 2000 Haw. Sess. L. Act 182, §§ 5, 17 at 361–62, 366; 2000 Haw. Sess. L. Act 253,

§§ 150, 152 at 916; 2006 Haw. Sess. L. Act 1, § 1, 50 at 427, 447. Certain amendments to the statute in 2002 and 2006 are discussed below where relevant. 2002 Haw. Sess. L. Act 39,

ties, and reimbursements collected by or on behalf of the insurance division under [HRS] title 24," subject to certain exceptions, were to "be deposited into the [IRF]." *Id.*

The insurance commissioner was directed to make assessments against insurers, with criteria for assessments to be established by rules he or she promulgated. HRS § 431:2–215(d)(1).[2] The assessments had to bear a reasonable relationship to the costs of regulating the line or type of insurance, including any administrative costs of the insurance division. HRS § 431:2–215(d)(3). The monies in the IRF were to be used by the insurance commissioner to carry out his or her duties and obligations under the insurance code. HRS § 431:2–215(a). For example, the insurance division prosecuted fraud committed against insurers. Of paramount importance for present purposes, the funds in the IRF were not allowed to revert to the general fund. HRS § 431:2–215(c).

The insurance commissioner collected assessments from insurers proportionate to each insurer's "line or type of insurance." Hawai'i Administrative Rules § 16–175.3 (2002). This figure was based on the insurer's market share percentage and pro rata share of the other insurance division costs. *Id.* The insurance commissioner calculated the total assessments for a given fiscal year by starting with the insurance division's operating cash requirements for the fiscal year. The commissioner would then project revenues, other than IRF assessments, for the year and deduct the revenues from the cash requirements. The resulting difference was the amount that the insurance commissioner would assess insurers for the IRF. In other words, the IRF assessments were calculated as follows: projected budget—projected non-IRF assessment revenues = IRF assessments. The insurance division's projected budget included the division's overhead expenses. In fiscal year 2000–2001, the insurance commissioner began to calculate the division's cash requirements to include an expense that represented a percentage of the DCCA's overhead, including charges for the

director's office, the administrative services office, the hearings office, and/or information services. HRS § 431:2–215(b). The DCCA provided the insurance division with, *inter alia,* personnel management services, review and processing of the insurance division's expenditures, the preparation of its annual operating budget, a forum for contested case hearings, computer system support, and various administrative services. The insurance division provided the DCCA with $4,335,792.00 between July 2, 2001 and December 17, 2004. In fiscal year 2003–2004, the commissioner began to allocate five percent of the revenues collected by the division to overhead expenses of the DBF. HRS §§ 431:2–215(b) and 36–27 (Supp.2003). In return, the DBF provided the insurance division with, *inter alia,* oversight of budget preparation and execution, determination of budgetary requirements and expenditures, management of employee benefit programs, management of public debt, and treasury programs. The insurance division provided the DBF with $376,360.00 between October 1, 2003 and December 31, 2004.

In addition to overhead expenses, the insurance division's annual budget included amounts intended to create a reserve of surplus funds in order to ensure the availability of monies to fund the insurance division. The reserve was also intended to provide the flexibility necessary to handle unplanned insurance rehabilitations and insolvencies that typically required the insurance division immediately to expend funds for the protection of policyholders. For a period of time, the reserve was set at double the budgeted cost of regulating the insurance industry or two times the total expenditures. For fiscal year 2002–2003, the reserve margin was decreased to one and one-half years of expenditures. In 2003, after the present action was filed, the target for the reserve margin was decreased to fifty or seventy-five percent of the insurance division budget. Throughout this fluctuation in the reserve margin, the margin was not subjected to the rulemaking process.

§§ 5, 22, at 115–16, 119; 2005 Haw. Sp. Sess. L. Act 1, §§ 1, 6, at 786, 788.

**2.** In 2005, the requirement that the insurance commissioner promulgate rules to calculate assessments was repealed. 2005 Haw. Sp. Sess. L. Act 1, §§ 1, 6, at 786, 788.

Prior to the present lawsuit, insurers, including HIC's members, were never informed of the insurance division's reserve objective and had no knowledge that their assessments were increased to effectuate this reserve objective. Since the IRF was established in 1999, HIC's members have paid the various fees and assessments imposed by the insurance commissioner. HIC's members' assessments have constituted roughly twenty to twenty-five percent of the total assessments levied by the insurance commissioner. In addition to receiving funds from assessments, the IRF was funded by monies transferred from defunct funds that were repealed when the IRF was established.

In 2002, the legislature merged the IRF into the compliance resolution fund (CRF). 2002 Haw. Sess. L. Act 39, §§ 1, 5, 22 at 111–12, 115–16, 119 (codified at HRS §§ 26–9 (Supp.2002) and 431:2–215 (Supp.2002)). As a result, monies that would previously have been deposited into the IRF were instead deposited into an insurance sub-account of the CRF. *See* HRS § 431:2–215(d)(2); *see also* Sen. Stand. Comm. Rep. No. 2547, in 2002 Senate Journal, at 1255. Also in 2002, the legislature determined that the IRF contained at least $4,000,000.00 in excess of the requirements of the fund. 2002 Haw. Sess. L. Act 178, § 40 at 793. In an effort to balance the state's budget, the legislature directed the transfer of these excess monies to the general fund through H.B. 2827. Conf. Comm. Rep. No. 160, in 2002 House Journal, at 1830, and in 2002 Senate Journal, at 1024; 2002 Haw. Sess. L. Act 178, § 40 at 793. The governor line-item vetoed portions of H.B. 2827, the result of which was that $2,000,000.00, rather than $4,000,000.00, was authorized to be transferred from the IRF to the general fund. Gov. Msg. No. 258, Statement of Objections to H.B. No. 2827, in 2002 House Journal, at 1115; 2002 Haw. Sess. L. Act 178, § 40 at 793, 796 n. 2. This was the first time that the legislature had transferred any funds out of the insurance special fund and into the general fund. The division did not foresee the transfer. On or about December 1, 2002, the insurance commissioner transferred $2,000,000.00 from the IRF or the CRF to the general fund. In 2003, the legislature determined that the CRF contained $15,000,000.00 in excess of its requirements and authorized an additional transfer of monies from the CRF to the general fund. 2003 Haw. Sess. Laws Act 178, §§ 28, 66 at 407, 412. The director of finance transferred $1,500,000.00 from the insurance sub-account of the CRF to the general fund in 2003. In all, $3,500,000.00 of the insurance special fund has been transferred to the general fund.

### B. *Circuit Court Proceedings*

HIC filed a complaint in the circuit court on September 27, 2002, seeking to enjoin the then-impending transfer of $2,000,000.00 to the general fund on the ground that the transfer converted the assessments into an illegal and unconstitutional tax. HIC additionally sought declaratory relief as well as an accounting. HIC filed a first amended complaint on January 12, 2005, asserting the following claims: unconstitutional tax, statutory scheme,[3] illegal transfer, due process, separation of powers, equal protection, violation of HRS § 431:7–204 (1993), violation of trust doctrine, and accounting.

With respect to its unconstitutional tax claim, HIC alleged, *inter alia*, that the assessments imposed by HRS § 431:2–215 were unconstitutional taxes in their entirety in light of this court's decision in *State v. Medeiros*, 89 Hawai'i 361, 973 P.2d 736 (1999), because HIC's members were not direct beneficiaries of a particular service, the assessments were not allocated directly to defraying a cost of providing the service, and the assessments were not reasonably proportionate to the benefit received. HIC additionally alleged that the transfer of funds from the IRF and the insurance regulation sub-account of the CRF to the general fund was an unconstitutional tax. With respect to its due process claim, HIC averred that the assessments of the insurance commissioner from 1999 to the present imposed a tax on HIC's members, which was violative of the

---

**3.** In HIC's statutory scheme claim, it alleges that HRS §§ 431:2–215(c) and 431:2–216(c) (Supp. 2003) expressly prohibit the transfer of monies to the general fund that were initially deposited by the insurance commissioner into the CRF.

due process clauses of the Hawai'i and United States Constitutions. In its separation of powers claim, HIC maintained that the assessments constituted a tax violative of the separation of powers doctrine because the legislature lacked the authority to delegate its taxing power and because, by empowering the insurance commissioner to levy the assessments, the legislature had effectively delegated its taxing power to the commissioner. With respect to its equal protection claim, HIC asserted that the assessments amounted to an improper tax violative of the equal protection clauses of the Hawai'i and United States Constitutions, because the varying amounts of the assessments set by the insurance commissioner bore no rational relationship to any legitimate state purpose. With respect to its claim under HRS § 431:7–204, HIC observed that the statute provided that:

> As to insurers, the taxes and fees imposed by [HRS] 431:7–201 to [HRS] 431:7–204, and the fees imposed by [the insurance] code, when paid shall be in settlement of and in lieu of all demands for taxes, licenses, or fees of every character imposed by the laws of this State, the ordinances or other laws, rules, or regulations of any county of this State....

HIC alleged that the assessments constituted a tax in violation of the foregoing provision. With respect to its accounting claim, HIC averred that the assessments by the insurance commissioner had not been properly accounted for, which was necessary to determine whether the assessments qualified as fees under *Medeiros* and whether they comported with HRS § 431:2–215.

The State answered the first amended complaint by asserting (1) that HIC's members had failed to exhaust their administrative remedies, (2) that, if the transferred assessments were deemed to be taxes, then the court did not have jurisdiction under HRS § 632–1 (1993) because the present matter would be tantamount to a controversy respecting taxes, (3) that the State was not subject to suit under the doctrine of sovereign immunity, and (4) that HIC lacked standing to sue because none of its members had an interest in any monies in the IRF or the CRF, except to the extent that HIC's

members could have sought a refund pursuant to HRS § 431:7–203 (Supp.2002).

The State filed a first amended motion for summary judgment on January 31, 2005, and HIC filed a cross motion for summary judgment on the following day. The circuit court ruled that HIC was entitled to summary judgment on its claims of unconstitutional tax, due process, separation of powers, equal protection, violation of HRS § 431:7–204, and accounting. The circuit court granted HIC's request for an accounting and for injunctive relief. The circuit court further rejected the State's defenses that this case involved a "tax matter" under HRS § 632–1 and that HIC members had failed to exhaust their administrative remedies. Still, the circuit court ruled that the State was entitled to summary judgment as to HIC's claims of statutory scheme, illegal transfer, and violation of trust doctrine. The State filed a motion for reconsideration. The circuit court denied the motion, but granted a stay pending appeal of the injunction, judgment, and accounting with certain conditions. Final judgment was entered on February 27, 2006, and the State filed a timely notice of appeal on March 28, 2006.

### C. *Appellate Proceedings*

In its direct appeal to the ICA, the State argued that the circuit court erred in concluding that the assessments were unconstitutional taxes under *Medeiros*, because that decision was inapposite to the present matter insofar as it involved a user fee, as opposed to a regulatory fee. The State maintained that, because the assessments were regulatory fees, *Medeiros* did not apply and that the ICA should instead apply the test set forth in *San Juan Cellular Telephone Co. v. Public Service Commission of Puerto Rico*, 967 F.2d 683 (1st Cir.1992). HIC countered that the assessments were in fact taxes under *Medeiros*, which was not inapposite, and that, because the assessments were taxes, they offended the separation of powers doctrine, the due process clauses, and the "in lieu" provision of HRS § 431:7–204. HIC further asserted that the assessments violated the equal protection clauses of the Hawai'i and United States Constitutions.

The ICA held that the assessments were taxes under *Medeiros* because the regulation of the insurance industry directly benefitted the public-at-large and not the insurers who paid the assessments. *Hawaii Insurers Council,* 117 Hawai'i at 459–60, 184 P.3d at 774–75. The ICA reasoned that the assessments were taxes because they were not allocated directly to defraying the costs of providing services to the insurers and were not reasonably proportionate to the benefits received by the insurers. *Id.* at 460, 184 P.3d at 775. The ICA observed that *Medeiros* precluded it from applying the test set forth in *San Juan Cellular,* as the State had urged, because *Medeiros* made no distinction between regulatory and user fees. *Id.* at 461, 184 P.3d at 776. The ICA further held that, because the assessments levied by the insurance commissioner were invalid taxes, the legislature had, in effect, unconstitutionally delegated its taxing power. *Id.* The ICA also concluded that, because the assessments were taxes, they violated the "in lieu" provision of HRS § 431:7–204. *Id.* at 462, 184 P.3d at 777. The ICA declined to address HIC's due process contention, but it did take up HIC's equal protection argument, holding that the regulatory fees authorized by HRS § 431:2–215 were rationally related to the statutory objective of defraying the insurance division's administrative costs and costs incurred by supporting offices and divisions and that the circuit court erred in concluding that the assessments violated the equal protection clauses of the Hawai'i and United States Constitutions. *Id.*

The State further argued that the circuit court lacked subject-matter jurisdiction over the present matter because HIC's members had failed to exhaust their administrative remedies under HRS § 431:7–203(a) or, in the alternative, because HIC had sought declaratory relief with respect to taxes pursuant to HRS § 632–1. The ICA disagreed, concluding that HRS § 431:7–203(a) did not establish any available administrative mechanism for challenging the constitutionality of assessments levied upon insurers and that HRS § 632–1 did not apply because HIC was not attempting to keep the State from assessing or collecting taxes. *Id.* at 462, 184 P.3d at 777. Finally, the State asserted that

sovereign immunity barred HIC's claim for a reimbursement of assessments. The ICA rejected this contention, reasoning that the issue of refunds was not presented on appeal because it was not addressed in the circuit court's order granting summary judgment. *Id.* at 463, 184 P.3d at 778. Accordingly, the ICA affirmed the circuit court's final judgment. *Id.*

Associate Judge Corinne K.A. Watanabe filed a separate concurring opinion, expressing her concern regarding the impact that the circuit court's decision might have on specially funded programs and the integrity of the state's fiscal infrastructure if the test in *Medeiros* were not adjusted. *Id.* at 464, 184 P.3d at 779 (Watanabe, J., concurring). She emphasized that other courts examining the issue of regulatory fees have adopted a broader test in determining whether such fees constituted taxes. *Id.*

The ICA entered its judgment on appeal on May 5, 2008, and the State filed a timely application for a writ of certiorari on July 30, 2008. We accepted the application on September 8, 2008 and heard oral argument on November 6, 2008.

## II. *STANDARDS OF REVIEW*

### A. *Certiorari*

■ The acceptance or rejection of an application for a writ of certiorari is discretionary. HRS § 602–59(a) (Supp.2007). In deciding whether to accept the application, this court considers whether the ICA's decision reflects "(1) [g]rave errors of law or of fact[ ] or (2) [o]bvious inconsistencies ... with [decisions] of th[is] court, federal decisions, or [the ICA's] own decision[s]" and whether "the magnitude of those errors or inconsistencies dictat[es] the need for further appeal." *Id.* § 602–59(b).

### B. *Summary Judgment*

■ This court reviews the circuit court's grant of summary judgment *de novo. Price v. AIG Haw. Ins. Co.,* 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawaiʻi Rules of Civil Procedure Rule 56(c).

### III. *DISCUSSION*

A. *The Insurance Commissioner's Assessments Were Not Unconstitutional When They Were Initially Imposed, But The Legislature's Transfer Of $3,500,000.00 Of Those Funds Into The General Fund Was Unconstitutional Under The Separation Of Powers Doctrine.*

■■■ HIC argues that the insurance commissioner's assessments offend the separation of powers doctrine because they resulted from an impermissible delegation of the power to tax from the legislature to the insurance division. The Hawaiʻi Constitution does not grant the executive branch the power to tax. Specifically, the Hawaiʻi Constitution directs that

> [t]he taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties, with the exception of the county of Kalawao. The legislature shall have the power to apportion state revenues among the several political subdivisions. [4]

Haw. Const. art. VIII, § 3. This court elucidated the contours of the foregoing principle in *McCandless v. Campbell,* 20 Haw. 411, 420 (1911), as follows:

> The power of taxation is essentially a legislative power. It cannot be delegated except to municipalities which themselves exercise subordinate legislative powers. The power to tax must not be confused with the administrative duties which are necessarily involved in the assessment and collection of taxes. In the nature of things, the legislature itself cannot attend

to all the details involved in the enforcement of the law. Those must of necessity be entrusted to administrative officers. But the tax can be imposed only by the legislative power. No arbitrary discretion to fix the rate of a tax, or to determine the method by which it is to be levied, or to adjust its apportionment among the taxpayers, where the principles upon which the apportionment is to be made are not fixed, can be left to the executive branch of the government.

Nonetheless, "[n]ot every exaction by state authorities is a tax." *Hexom v. Oregon Dep't of Transp.,* 177 F.3d 1134, 1135 (9th Cir. 1999). The legislature may delegate the state's police power to state authorities to allow them to assess fees. *Medeiros,* 89 Hawaiʻi at 366, 973 P.2d at 741. Generally, a fee is exchanged for a service rendered or a benefit conferred, and the amount of the fee normally bears a relationship to the value of the service or benefit. *Bolt v. City of Lansing,* 459 Mich. 152, 587 N.W.2d 264, 269 (1998).

#### 1. *Medeiros is distinguishable.*

■■ In the present matter, the State argues that the assessments via HRS § 431:2-215 are properly characterized as fees that the insurance commissioner has the authority to collect, while HIC maintains that the assessments are unconstitutional taxes violative of the separation of powers doctrine pursuant to this court's holding in *Medeiros,* 89 Hawaiʻi 361, 973 P.2d 736.

On the one hand, this court has defined the term "tax" as follows:

> Taxes are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government, and for all public needs.

> Taxes are generally defined as burdens or charges imposed by legislative authority on persons or property to raise money for public purposes, or, more briefly, an imposition for the supply of the public treasury.

---

4. The ICA explained that "[t]he term 'political subdivision' as it appears in [article VIII, section 3 of the Hawaiʻi Constitution] refers to counties." *Hawaii Insurers Council,* 117 Hawaiʻi at 459, 184

P.3d at 774 (citing Stand. Comm. Rep. No. 53, Committee on Local Government, 1 *Proceedings of the Constitutional Convention of Hawaiʻi of 1968,* at 229 (1973)).

The word taxes is very comprehensive, and properly includes, as indicated in the foregoing definition, all burdens, charges and impositions by virtue of the taxing power with the object of raising money for public purposes.

*McCandless,* 20 Haw. at 420 (citations and quotation marks omitted). This definition is consistent with the plain meaning of the term "tax": "A monetary charge imposed by the government on persons, entities, transactions, or property to yield public revenue." *Black's Law Dictionary* 1496 (8th ed.2004); *see also San Juan Cellular,* 967 F.2d at 685 ("The classic 'tax' is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community.").

▮ On the other hand, in *Medeiros,* this court identified two common types of fees:

"Fees imposed by a governmental entity tend to fall into one of two principal categories: user fees, based on the rights of the entity as a proprietor of the instrumentalities used, or regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities."

89 Hawai'i at 366, 973 P.2d at 741 (quoting *Emerson Coll. v. City of Boston,* 391 Mass. 415, 462 N.E.2d 1098, 1105 (1984)). Thus, as noted, a user fee is "'based on the rights of the entity as a proprietor of the instrumentalities used.'" *Id.* at 366, 973 P.2d at 741 (quoting *Emerson Coll.,* 462 N.E.2d at 1105); *see also Black's Law Dictionary* 1579 (defining a "user fee" as "[a] charge assessed for the use of a particular item or facility"). Examples of user fees include bridge tolls, *Gargano v. Lee County Bd. of County Comm'rs,* 921 So.2d 661, 668 (Fla.Dist.Ct. App.2006), charges for sewer hookups, *Contractors & Builders Ass'n of Pinellas County v. City of Dunedin,* 329 So.2d 314, 317–18 (Fla.1976), and charges for managing wastewater, *Missouri Growth Ass'n v. Metro. St. Louis Sewer Dist.,* 941 S.W.2d 615, 622–25 (Mo.Ct.App.1997). By contrast,

[t]he classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes

directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*San Juan Cellular,* 967 F.2d at 685 (citations omitted). Regulatory fees are authorized by the state's police power to regulate particular businesses or activities. *Medeiros,* 89 Hawai'i at 366, 973 P.2d at 741 (quoting *Emerson Coll.,* 462 N.E.2d at 1105). The police power of the state "is broad and extends to the public safety, health, and welfare." *State v. Ewing,* 81 Hawai'i 156, 164, 914 P.2d 549, 557 (App.1996). Examples of regulatory fees include a state guaranty fund assessment levied on certain insurance companies in order to provide a fund for the protection of policyholders of insolvent insurers and to support their orderly rehabilitation or liquidation, *Principal Life Ins. Co. v. United States,* 70 Fed.Cl. 144, 170 (2006), a $3.00 transaction fee for each pawn shop transaction report filed with the police department, *Jachimek v. State,* 205 Ariz. 632, 74 P.3d 944, 949 (Ct.App.2003), and fees assessed by a city against telecommunication service providers, including permit, registration, application, license, and franchise fees, *Pac. Bell Tel. Co. v. City of Hawthorne,* 188 F.Supp.2d 1169, 1177 (C.D.Cal.2001).

In the case at hand, the ICA relied on this court's holding in *Medeiros* in determining that the insurance division's assessments were unconstitutional taxes and not fees. *Hawaii Insurers Council,* 117 Hawai'i at 459–60, 184 P.3d at 774–75. In *Medeiros,* a defendant who pled guilty to a charge of unauthorized entry into a motor vehicle filed a motion to enjoin enforcement of chapter 6, article 52 of the Revised Ordinances of the City and County of Honolulu (ROCCH) (Supp.1998), which provided for the collection of a fee from persons convicted of misdemeanors and felonies "'for services performed by the city in connection with the arrest, processing, investigation, and prosecution of the convicted person.'" 89 Hawai'i at 362 n. 1, 973 P.2d at 737 n. 1 (quoting ROCCH § 6–52.2). The circuit court grant-

ed the motion on the ground that the ordinance was an unconstitutional tax that the city had no authority to assess. *Id.* at 363–64, 973 P.2d at 738–39. On appeal, the city argued that the assessment was a fee authorized by HRS § 46–1.5(8) (1993).[5] In affirming the decision of the circuit court, this court noted that, although ROCCH § 6–52.2 characterized its charge as a "fee," "the nature of the tax or 'charge' that a law imposes is not determined by the label given to it but by its operating incidence." *Id.* at 366, 973 P.2d at 741 (quoting *Stewarts' Pharmacies v. Fase,* 43 Haw. 131, 144 (1959)) (brackets omitted). This court adopted a three-pronged test for determining whether such charges were fees as opposed to taxes. The test analyzed whether the charge (1) applied to the direct beneficiary of a particular service, (2) was allocated directly to defraying the costs of providing the service, and (3) was reasonably proportionate to the benefit received. *Id.* at 367, 973 P.2d at 742. In the course of formulating the *Medeiros* test, we quoted the following passage from *Emerson College:*

"[F]ees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of a society,' *National Cable Television Ass'n v. United States,* 415 U.S. 336, 341[, 94 S.Ct. 1146, 39 L.Ed.2d 370] ... (1974)[,] they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge, and the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses."

*Medeiros,* 89 Hawai'i at 366, 973 P.2d at 741 (quoting *Emerson Coll.,* 462 N.E.2d at 1105 (citation omitted)). We deviated from *Emer-*

son College by declining to adopt its "voluntariness" element because,

[s]ubsequent to its opinion in *Emerson College,* the Massachusetts Supreme Judicial Court has weakened its adherence to the second identifying factor described in *Emerson College*—voluntary receipt of the "service"—holding that "the element of choice is not a compelling consideration which can be used to invalidate an otherwise legitimate charge."

*Id.* In applying the test to the facts before us, we determined that ROCCH § 6–52.2 did not satisfy the first and second prongs of the test. *Id.* at 370, 973 P.2d at 745. First, the ordinance did not benefit the payor of the charge, the defendant, but instead benefitted society as a whole. *Id.* at 368, 973 P.2d at 743. Second, the ordinance was not "allocated directly to defraying the costs of providing the service" because it seemingly allowed any "remaining revenues" from the fee to be used for general purposes. *Id.* at 367, 973 P.2d at 742. Accordingly, we held that ROCCH § 6–52.2 was invalid because it authorized the imposition of a tax and because the state had not empowered the city to impose such a tax. *Id.* at 370, 973 P.2d at 745.

The State maintains that *Medeiros* is distinguishable from the present matter because it dealt with an alleged "service" or "user" fee,[6] while the present case involves an alleged "regulatory" fee. The State (1) argues that the *Medeiros* test is proper only for distinguishing between user fees and taxes and (2) notes that the *Medeiros* test was largely derived from the *Emerson College* test which, like *Medeiros,* involved an alleged service fee. HIC asserts numerous arguments as to why the *Medeiros* test should be applied in the present matter. First, HIC claims that *Medeiros,* in its exposition of the

---

**5.** HRS § 46–1.5(8) provides that, "[s]ubject to general law, each county shall have the following powers and shall be subject to the following liabilities and limitations ... (8) Each county shall have the power to fix the fees and charges for all official services not otherwise paid for."

**6.** The terms "user fee" and "service fee" are essentially interchangeable. *See Util. Audit Co. v. City of Los Angeles,* 112 Cal.App.4th 950, 5 Cal.Rptr.3d 520, 526 (2003) ("User fees are

amounts charged to a person using a service where the amount of the charge is generally related to the value of the services provided."); *Continental Airlines, Inc. v. United States,* 77 Fed. Cl. 482, 484 n. 2 (2007) ("Defendant refers to the agricultural quarantine inspection services fee as the 'AQI user fee,' while plaintiff calls it the 'APHIS user fee' ... For ease of discussion, the Court will refer to these fees as AQI user fees.").

difference between taxes and fees, did not create separate tests for distinguishing user fees and regulatory fees, on the one hand, from taxes, on the other. On its face, *Medeiros* employs a three-pronged test in order to determine whether a charge is a fee or a tax without explicitly stating that the test differentiates between "user fees" and taxes. *Id.* at 367, 973 P.2d at 742. HIC thus highlights the extent of our citation to *Emerson College* in *Medeiros,* in which *Emerson College* was seemingly discussing "fees" as a whole:

> "Fees imposed by a governmental entity tend to fall into one of two principal categories: user fees, based on the rights of the entity as a proprietor of the instrumentalities used, or regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities. *Such fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of a society,' National Cable Television Ass'n v. United States,* 415 U.S. 336, 341[, 94 S.Ct. 1146, 39 L.Ed.2d 370] ... (1974); ... *and the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.*"

*Medeiros,* 89 Hawai'i at 366, 973 P.2d at 741 (quoting *Emerson Coll.,* 462 N.E.2d at 1105) (emphases added). Accordingly, HIC contends that we should apply the *Medeiros* test to the present matter regardless of the type of fee that is allegedly at issue.

■■■ Different rationales underlie the assessment of user and regulatory fees. A user fee is generally charged to the recipient of a service provided by the government, such as the use of a toll bridge, *see Gargano,* 921 So.2d at 668, or entry into a regulated profession, *see Seafarers Int'l Union of N. Am. v. United States Coast Guard,* 81 F.3d 179, 189–90 (D.C.Cir.1996) (holding that Coast Guard licensing program fees were user fees and noting that fees for licenses and registrations are classic examples of user fees). On the other hand, a regulatory fee is authorized by the state's police power to prescribe regulations for the promotion of "public safety, health, and welfare," *Ewing,* 81 Hawai'i at 164, 914 P.2d at 557. In *Medeiros,* following our review of *Emerson College's* test, we adopted

> a modified *Emerson College* test for determining whether a charge is a fee or a tax, in which we analyze whether the charge (1) applies to the direct beneficiary of a particular *service,* (2) is allocated directly to defraying the costs of *providing the service,* and (3) is reasonably proportionate to the benefit received.

89 Hawai'i at 367, 973 P.2d at 742 (emphases added). Like the test developed in *Emerson College,* a decision that, like *Medeiros,* dealt with an alleged service fee, *see Emerson Coll.,* 462 N.E.2d at 1106 ("Under the statute, the city is authorized to impose a fee for augmented fire services.") (internal quotation marks omitted), our modified test focused on elements of "service," namely whether the payor was a beneficiary of a service and whether the funds defrayed the costs of the provider of the payor's service. Consequently, the *Medeiros* test was and is intended to distinguish between taxes and service fees, not regulatory fees.

HIC contends that *National Cable,* 415 U.S. 336, 94 S.Ct. 1146, a decision cited in *Emerson College* and consequently in *Medeiros,* 89 Hawai'i at 366, 973 P.2d at 741, is relevant to the present matter because it distinguishes between taxes and regulatory fees. In *National Cable,* the National Cable Television Association, a trade association that represented community antenna television (CATV) systems, challenged assessments by the Federal Communications Commission (FCC), which was authorized to regulate the CATV systems. 415 U.S. at 337–38, 94 S.Ct. 1146. The regulatory fees were imposed pursuant to

> [t]he Independent Offices Appropriation Act, 1952, Tit. 5, 65 Stat. 290, 31 U.S.C. s 483a, which provided in relevant part: "It is the sense of the Congress that any work, service ... benefit, ... license, ... or similar thing of value or utility performed, furnished, provided, granted ... by any Federal agency ... to or for any person (including ... corporations ...) ... shall

be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation ... to prescribe therefor ... such fee, charge, or price, if any, as he shall determine ... to be fair and equitable *taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts* ...."

*Id.* at 337, 94 S.Ct. 1146 (ellipses in original) (emphasis added). The United States Supreme Court reviewed this statute and concluded that

[a] "fee" connotes a "benefit" and the Act by its use of the standard "value to the recipient" carries that connotation. The addition of "public policy or interest served, and other pertinent facts," if read literally, carries an agency far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House.

*Id.* at 341, 94 S.Ct. 1146. Thus, when analyzing whether the fees were lawful, the Supreme Court focused on the "value to the recipient" clause of the statute. It concluded that CATV systems should only pay regulatory fees equivalent to the value of services received, stating that,

[w]hile those who operate CATV's may receive special benefits, we cannot be sure that the [c]ommission used the correct standard in setting the fee. It is not enough to figure the total cost (direct and indirect) to the [c]ommission for operating a CATV unit of supervision and then to contrive a formula that reimburses the [c]ommission for that amount. Certainly some of the costs inured to the benefit of the public, unless the entire regulatory scheme is a failure, which we refuse to assume.

*Id.* at 343, 94 S.Ct. 1146. As a result, the Supreme Court held that the fees that the FCC assessed the CATVs were unconstitutional taxes.

HIC's contention that the *National Cable* shoe fits here is unpersuasive. The Supreme Court has subsequently explained that *National Cable* "st[oo]d *only* for the proposition that Congress must indicate clearly its inten-

tion to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Skinner v. Mid–America Pipeline,* 490 U.S. 212, 213–14, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989) (emphasis added); *see also Union Pac. R.R. Co. v. Pub. Util. Comm'n,* 899 F.2d 854, 860 (9th Cir.1990) ("*National Cable* ... [was] concerned with the interpretation of a statute. At issue was the meaning of 'fee, charge, or price' in a provision ... directing federal agencies to collect a 'fee, charge, or price' for any 'work, service, benefit, ... or similar thing of value ... granted, prepared, or issued by any Federal agency.' "). There is no language in the Hawai'i Insurance Code or the administrative regulations promulgated under the code similar to the "value to the recipient" clause at issue in *National Cable.* Instead, the statute in the present matter provides that the insurance commissioner's assessments "shall bear a reasonable relationship to the costs of regulating the line or type of insurance, including any administrative costs associated of the division." HRS § 431:2–215(d)(3). Accordingly, we do not find *National Cable* to be instructive in the present matter.

■ Nor are we swayed by *National Cable's* determination that, under the act at issue, the FCC's fees should have benefitted the CATV providers. *See* 415 U.S. at 341, 94 S.Ct. 1146. *National Cable's* position stemmed solely from the "value to the recipient" clause of the governing statute and did not overrule the Supreme Court's foundational regulatory fee decision, *Edye v. Robertson,* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). *See San Juan Cellular,* 967 F.2d at 687. In *Edye,* the Supreme Court expressly placed the burden of regulatory funding on those "who make profit out of [the regulated business]," and recognized that the regulatory fees were used by the government "for the protection of the citizens." 112 U.S. at 596, 5 S.Ct. 247. The California Supreme Court has adopted a similar concept of regulatory fees, explaining that "regulatory fees in amounts necessary to carry out the regula-

tion's purpose are valid despite the absence of any perceived 'benefit' accruing to the fee payers." *See Sinclair Paint Co. v. State Bd. of Equilization,* 15 Cal.4th 866, 64 Cal. Rptr.2d 447, 937 P.2d 1350, 1355 (1997). These decisions illustrate all the more why the *Medeiros* test, which considers whether the payor of a charge received a benefit, 89 Hawai'i at 367, 973 P.2d at 742, is properly confined to evaluating whether the charge is a *user fee* or a tax.

In an attempt to batten down every hatch of its argument, HIC further asserts that the alleged fees at issue in *Medeiros,* like the ones at issue in the present case, were regulatory fees. HIC bases its argument on *Emerson College's* definition of regulatory fees, quoted in *Medeiros,* as "including licensing and inspection fees" and being "founded on the police power to regulate particular businesses or activities." *Emerson Coll.,* 462 N.E.2d at 1105, *quoted in Medeiros,* 89 Hawai'i at 366, 973 P.2d at 741. HIC gloms onto the "police power" aspect of the definition in arguing that "*Medeiros* plainly concern[ed] the 'police power' of 'criminal investigative services,' not a user fee as suggested by [the state]." (Citing *Medeiros,* 89 Hawai'i at 363, 366, 973 P.2d at 738, 741.) HIC's

argument is discordant with the position taken by the city in *Medeiros,* unpersuasively,[7] that the alleged fees at issue were being charged in return for the "service" of the "arrest and prosecution" of the convict, a service that, for instance,

> assists persons in preventing further harm to themselves, especially in the case of a drunk driver who, if not apprehended, could kill himself or others, and it prevents them from harming others. Hopefully, this service also helps to convince the offender to cease his unlawful activities and become a law-abiding and productive member of society.

*Medeiros,* 89 Hawai'i at 368–69, 973 P.2d at 743–44 (brackets omitted). *Medeiros* dealt with an alleged service fee, not a regulatory fee, and modified the *Emerson College* test to determine whether the charge at issue was a service fee or a tax. In the present matter, the assessments at issue are clearly of a regulatory nature, having been levied by the commissioner of the insurance division, the facet of the DCCA that is empowered to exercise the state's police power to regulate the insurance industry. *See* HRS §§ 431:2–101 and 431:2–102. Accordingly, we are not bound by our analysis in *Medeiros.*[8]

---

7. Not only was the argument unpersuasive, but its Orwellian nature elicited an *à propos* citation to George Orwell's *Nineteen Eighty–Four. Medeiros,* 89 Hawai'i at 369 n. 8, 973 P.2d at 744 n. 8.

8. Our holding in *In re Water Use Permit Applications,* 94 Hawai'i 97, 9 P.3d 409 (2000), this court's only subsequent application of the *Medeiros* test in a published opinion, does not preclude our conclusion that the *Medeiros* test applies solely to alleged user fees. *In re Water Use* dealt with the distribution of water from the Waihole Ditch to persons applying for water use permits. At an expansive contested case hearing, the Commission on Water Resource Management, an instrumentality of the Department of Land and Natural Resources, announced its plan to establish technical advisory committees to assess the implementation of the final decision, determine the feasibility of using treated wastewater over potable aquifers, and recommend studies, conservation measures, and monitoring plans. *Id.* at 118, 9 P.3d at 430. A portion of the committees' studies and monitoring activities were to be paid for by recipients of permits to use the Waihole Ditch, with each recipient's charge calculated as a pro rata share of the amount of water received. *Id.* Certain permittees challenged this

portion of the commission's decision, alleging that the funding requirement constituted an "illegal tax" under *Medeiros. Id.* at 185, 9 P.3d at 497. This court applied the *Medeiros* test and concluded that "the [c]ommission has the general authority to condition the permits upon compliance with the instant funding requirement, *which more properly falls under the category of a regulatory fee,* rather than a land development exaction." *Id.* at 186, 9 P.3d at 498 (emphasis added).

Although we seemingly classified the fee in *In re Water Use* as a "regulatory fee," we did so in passing, as the type of fee at issue was not dispositive of the case, as it is here. In fact, a further review of *In re Water Use* illustrates that it in fact dealt with "user fees." The goal of the State Water Code is to regulate the *use* of Hawaii's water. *See* HRS §§ 174C–2(a) (1993) ("It is recognized that the waters of the State are held for the benefit of the citizens of the State. It is declared that the people of the State are beneficiaries and have a right to have the waters protected for their *use.*" (emphasis added)) and 174C–2(c) (1993) ("The state water code shall be liberally interpreted to obtain maximum beneficial *use* of the waters of the State for purposes such as domestic *uses,* aquaculture *uses,* irriga-

We now turn to the question whether the insurance division's assessments constituted allowable regulatory fees or unconstitutional taxes. To answer this question, the State urges us to look to *San Juan Cellular*, which distinguished between regulatory fees and taxes. In *San Juan Cellular*, the Puerto Rico Public Service Commission levied a three-percent "periodic fee" against a private cellular company. 967 F.2d at 684. The company challenged the fee as unlawful, and the federal district court granted declaratory relief on the ground that federal statutes and regulations pre-empted the local government's authority to impose such a charge. *Id.* The commission appealed, asserting that the district court did not have jurisdiction in light of the federal Tax Injunction Act, which prohibited the "district court from restraining the assessment or collection of any tax imposed by the laws of Puerto Rico, 48 U.S.C. § 872, unless no 'plain, speedy and efficient' remedy is available in the Commonwealth's courts, 28 U.S.C. § 1341." *San Juan Cellular*, 967 F.2d at 684. The United States Court of Appeals for the First Circuit, in an opinion by then-Chief Judge Stephen G. Breyer, held that the act did not divest the district court of jurisdiction, because the three-percent "periodic fee" was not an tax, but a regulatory fee. *Id.* at 685–86. In making that determination, the First Circuit formulated a three-pronged test to divine whether the assessment was a regulatory fee, specifically considering whether (1) "[a] regulatory agency assesses the fee[,]" (2) "[t]he agency places the money in a special fund[,]" and (3) "[t]he money is not used for a general purpose but rather to defray the expenses generated in specialized investigations and studies, for the hiring of professional and expert services and the acquisition of the equipment needed for the operations provided by law for the [payor]." *Id.* at 686 (cita-

tions and brackets omitted). In applying the foregoing test, the First Circuit held that the commission's "periodic fee" was "close to the 'fee' end of the spectrum." *Id.*

The First Circuit was not persuaded by the argument that because, by statute, the unused revenue generated by the periodic fees would ultimately revert to the general fund after five years, the assessment was therefore a tax. The First Circuit swatted down the argument with the observation that

> [p]erhaps this instruction would make a difference were there some evidence in the record that *large amounts* of the revenue the [assessor] obtains would end up in the general fund. But, nothing in the record before us, or in the statute, suggests that the [assessor] will fail to spend most, or all, [of] the revenue raised for the specific statutory objectives.

*Id.* at 687 (emphasis added) (citations omitted). The present matter differs from this aspect of *San Juan Cellular* in light of the "large amounts" of the insurance division's revenue, $3,500,000.00, that was extracted to benefit the state's general fund. Furthermore, as we are not presented with a case dealing with *de minimis* funds reverting from a regulatory agency to a general fund, we will not address the issue here.

The *San Juan Cellular* test comports with the foregoing discussion of regulatory fees, inasmuch as it describes monies that are collected by a regulatory agency to be used for the agency's defined purposes. *See Medeiros*, 89 Hawai'i at 366, 973 P.2d at 741 ("'Regulatory fees are authorized by the state's police power to regulate particular businesses or activities.'" (quoting *Emerson Coll.*, 462 N.E.2d at 1105)). Furthermore, unlike the user fee test adopted in *Medeiros*, the *San Juan Cellular* test recognizes that

tion and other agricultural *uses*, power development, and commercial and industrial *uses*." (emphases added)). This court further explained the manner in which the permittees' payment of the fees would benefit their water use, both by assisting them in marshaling the requisite proof that their use would not stand in opposition to the public interest and by "allowing them exclusive *use* of public resources" in the interim before a determination of the effects to the public of the permittees water use was concluded. *In re Water*

*Use*, 94 Hawai'i at 185, 9 P.3d at 497 (emphasis added). Accordingly, the fees that the permittees were assessed were more akin to "user fees," and therefore *Medeiros* was correctly applied in the case. *See, e.g., Kentucky River Auth. v. City of Danville*, 932 S.W.2d 374, 377 (Ky.Ct.App.1996) (holding that assessments charged to city for the purposes of controlling and conserving river basin water source were user fees, not taxes), *cited in In re Water Use*, 94 Hawai'i at 185, 9 P.3d at 497.

regulatory fees need not benefit the regulated payor of the fee in order to be valid. *See also Edye*, 112 U.S. at 596, 5 S.Ct. 247; *Sinclair Paint Co.*, 64 Cal.Rptr.2d 447, 937 P.2d at 1355. Accordingly, we believe that the *San Juan Cellular* test is ideal for determining whether an assessment is a regulatory fee or a tax, and we will now apply it to the facts of the case at hand.

### 2. *Application of the San Juan Cellular Test*

■ The first prong of the *San Juan Cellular* test, that is, whether a regulatory agency assesses the fee, 967 F.2d at 686, is satisfied in the present matter because the charges at issue were assessed by the commissioner of the insurance division of the DCCA. The insurance commissioner is vested with the authority to enforce the Insurance Code, HRS title 24, which regulates the insurance industry. *See* HRS § 431:2–201(b) (1993). The second prong, which asks whether the agency places the money in a special fund, *San Juan Cellular*, 967 F.2d at 686, is also satisfied because the assessments were placed into a "special fund," namely, the IRF, by the insurance commissioner; the IRF later merged into the CRF and was intended to be utilized to reimburse the insurance division for the cost of regulating the insurance industry. *See* HRS § 431:2–215(c).

The third prong of the *San Juan Cellular* test requires a more searching inquiry. It evaluates whether "the money is not used for a general purpose but rather to defray the expenses generated in specialized investigations and studies, for the hiring of profes-

sional and expert services and the acquisition of the equipment needed for the operations provided by law for the [payor]." 967 F.2d at 686 (brackets omitted); *see also Bidart Bros. v. California Apple Com'n*, 73 F.3d 925, 931 (9th Cir.1996) (articulating the third prong of the *San Juan Cellular* test as "whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed"). HIC asserts that the insurance commissioner's assessments, as a whole, represent unconstitutional taxes under *Medeiros*. In particular, HIC points to the expenditures by the insurance commissioner for: (1) general overhead of the insurance division, the DCCA, and the DBF; (2) the cash reserve accumulated by the insurance division; and (3) the monies transferred to the general fund as being violative of the user-fee test in *Medeiros*. Inasmuch as we are not applying the *Medeiros* test here, we will instead review these expenditures under the third prong of the *San Juan Cellular* test to determine whether they were "expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *See Bidart Bros.*, 73 F.3d at 931.

#### a. *DCCA and DBF overhead*

HIC notes that over $4,000,000.00 was transferred from the IRF to support the overhead of the DCCA and $375,000.00 for the benefit of the DBF. The State argues that these funds constituted the insurance division's pro rata share of the DCCA's and the DBF's expenses, pursuant to HRS §§ 36–27,[9] 36–30 (Supp.2003),[10] and 431:2–

---

9. HRS § 36–27, entitled "Transfers from special funds for central service expenses," provides in relevant part:

Except as provided in this section, and notwithstanding any other law to the contrary, from time to time, the director of finance, for the purpose of defraying the prorated estimate of central service expenses of government in relation to all special funds ... shall deduct five per cent of all receipts of all other special funds, which deduction shall be transferred to the general fund of the State and become general realizations of the State.

10. HRS § 36–30, entitled "Special fund reimbursements for departmental administrative expenses," provides in relevant part:

(a) Each special fund ... shall be responsible for its pro rata share of the administrative expenses incurred by the department responsible for the operations supported by the special fund concerned.

(b) Administrative expenses shall include:

(1) Salaries;

(2) Maintenance of buildings and grounds;

(3) Utilities; and

(4) General office expenses.

(c) The pro rata share of each special fund shall be that proportion of the administrative expenses of the department, including those paid from all special funds administered by the department, which the expenditures of the spe-

215(b).[11] It is apparent that, under *San Juan Cellular*, the monies paid to the DCCA and to the DBF were "used for the regulation or benefit of the parties upon whom the assessment is imposed." *See Bidart Bros.*, 73 F.3d at 931. In return for the insurance division providing its pro rata share of its costs, the DCCA provided the insurance division with, *inter alia*, personnel management services, review and processing of the insurance division's expenditures, the preparation of its annual operating budget, a forum for contested case hearings, computer system support, and various administrative services. The DBF provided the insurance division with, *inter alia*, oversight of budget preparation and execution, determination of budgetary requirements and expenditures, management of employee benefit programs, management of public debt, and treasury programs. The aforementioned services provided by the DCCA and the DBF to the insurance division assist it in carrying out its regulatory functions, and, accordingly, the expenditures that the insurance division was mandated to pay to the DCCA and the DBF do not constitute taxes under the *San Juan Cellular* test.

#### b. *Reserve fund*

 The insurance division has also maintained a practice of collecting assessments in excess of its operating costs in order to develop a reserve fund. The State argues that the reserve fund was created in order to protect against unforeseen emergency situations, such as the unplanned rehabilitation and liquidation of insurers or natural disasters, as well as to cushion the division's operating budget from yearly fluctuations in revenue. HIC argues that assessments for the purpose of creating the reserve do not bear a reasonable relationship to the costs of regulating the insurance industry, are not authorized by statute, and must therefore be declared illegal taxes.

In our view, the State's position that a reserve fund is essential to the insurance division's regulatory function is reasonable in light of the unpredictability of potential contingencies and fluctuations in the amount of funds available to the insurance division through assessments and other means. We are wary of second-guessing a regulatory agency's reasonable strategy for securing its continued ability to serve its public function. *See Collier v. City & County of San Francisco*, 151 Cal.App.4th 1326, 60 Cal.Rptr.3d 698, 708 (2007) ("[W]ere we to adopt a too narrow definition of 'regulatory activities' ..., we would risk depriving municipalities of a reasonable degree of flexibility to determine whether regulatory fee revenues collected by their agencies are being spent in furtherance of the purpose for which those fees were assessed."); *California Ass'n of Prof. Scientists v. Dep't of Fish & Game*, 79 Cal.App.4th 935, 94 Cal.Rptr.2d 535, 545–46 (2000) ("The legislative body charged with enacting laws pursuant to the police power retains the discretion to apportion the costs of regulatory programs in a variety of reasonable financing schemes."); *Brydon v. E. Bay Mun. Util. Dist.*, 24 Cal.App.4th 178, 29 Cal.Rptr.2d 128, 136 (1994) ("[C]ost allocations for services provided are to be judged by a standard of reasonableness with some flexibility permitted to account for system-wide complexity."). Accordingly, the portion of the assessments that went toward buttressing the insurance division's reserve fund were "used for the regulation or benefit of the parties upon whom the assessment is imposed," *see Bidart Bros.*, 73 F.3d at 931, and, having satisfied the third prong of the *San Juan Cellular* test, constitute legitimate regulatory fees.

#### c. *Transferred funds*

 HIC further argues that the assessments at issue fail the third prong of the *San*

---

cial fund bear to the total expenditures of the department....

**11.** HRS § 431:2–215(b) provides in relevant part:

Sums from the compliance resolution fund expended by the commissioner shall be used to defray any administrative costs, including personnel costs, associated with the programs of the division, and costs incurred by supporting offices and divisions.... [T]he commissioner may use the moneys in the fund to employ or retain, by contract or otherwise, ... hearings officers, attorneys, investigators, accountants, examiners, and other necessary professional, technical, administrative, and support personnel to implement and carry out the purposes of [HRS] title 24....

*Juan Cellular* test, because the $2,000,000.00 that was transferred from the IRF in 2002 and the $1,500,000.00 that was transferred from the CRF in 2003 (the transferred funds), in accordance with the legislature's decrees in 2002 Haw. Sess. L. Act 178, § 40 at 793 and 2003 Haw. Sess. Laws Act 178, §§ 28, 66 at 407, 412 (the transfer bills), were used for a general purpose by being deposited in the general fund. In countering HIC's position, the State asks us to focus on the fact that the transferred funds at issue were, in the first instance, solely designated for the insurance division's use and were shifted to the general fund over the strong opposition of the insurance commissioner and the director of the DCCA.

■ The State cites *Apodaca v. Wilson*, 86 N.M. 516, 525 P.2d 876 (1974), in support of its contention that an assessment's *initial* designation should define its character forevermore. In *Apodaca*, the Albuquerque City Commission adopted two ordinances, one that increased sewer and water service charges and another that, *inter alia*, indicated that water and sewer revenues had increased and that a large portion of the revenue increase would therefore be appropriated to the city's general fund. *Id.* at 878. The plaintiffs sought to enjoin the city from collecting the increased charges and to invalidate the ordinance increasing the charges on the ground that the charges were an illegal tax. *Id.* at 879. The New Mexico Supreme Court held that, " '[s]ince the rate charged is not a tax in its inception, ultimate use of surplus funds derived therefrom for the support of municipal government will not convert it into taxes or cause it to assume the nature of taxes.' " *Id.* at 885 (quoting *City of Niles v. Union Ice Corp.*, 133 Ohio St. 169, 12 N.E.2d 483, 489 (1938)).

The State's reliance on *Apodaca* is misplaced. That decision dealt with a *municipality's* ability to collect charges and then subsume the charges within its own general fund. The *Apodaca* decision relied heavily on the fact that the city was "acting in a business or proprietary capacity rather than in a governmental capacity." *Id.* at 884. With that in mind, the New Mexico Supreme Court held that, " 'when engaged in busi-

ness,' " a municipality does not tax, but instead charges " 'a price at which and for which the public utility service or product is sold.' " *Id.* at 885 (quoting *City of Niles*, 12 N.E.2d at 489). This is a far cry from the insurance division's role in the present matter, being neither "engaged in business" nor selling a product for profit. We are not presently addressing whether a *municipality* that is engaged in selling a " 'commodity' " such as water, *see id.* at 886 (quoting *Twitchell v. City of Spokane*, 55 Wash. 86, 104 P. 150, 151 (1909)), can use the profits as it sees fit. Furthermore, for reasons discussed below, we do not agree with *Apodaca's* general conclusion that a fee assessment's initial designation dictates its character perpetually.

The State also asserts that a levy placed directly into a general fund may sometimes constitute a valid regulatory fee, citing *Southview Co-Operative Housing Corp. v. Rent Control Board of Cambridge*, 396 Mass. 395, 486 N.E.2d 700 (1985). *Southview Co-Operative* involved landlords who brought suit to challenge the rent control board's ability to assess fees against them in connection with petitions for rent adjustments. *Id.* at 701. The landlords asserted that the assessments constituted impermissible taxes. *Id.* In concluding that the fees were lawful, the Massachusetts Supreme Judicial Court stated the following, upon which the State relies in the present matter:

> The plaintiffs are not helped by the fact that the collected fees were deposited in the general fund of the city, as the law requires, or by the fact that the challenged fee schedule was established to make up for a [budget] shortfall.... Every fee charged by a regulatory agency will reduce the amount of funding that must come from general government revenues, and thus will substitute for funds that would otherwise have to be raised through taxes. But, clearly, all such regulatory charges are not taxes.

*Id.* at 706. *Southview Co-Operative* is not applicable to the present matter for the crucial reason that the rent control board was not self-sufficient, whereas the DCCA and its insurance division are mandated by law to be so. Specifically, in *Southview Co-Operative*,

"[t]he board submitted a budget … with a financing plan in which approximately seventy per cent of the budget would be supported by intergovernmental revenues and approximately thirty per cent would be supported by charges for services." *Id.* at 702. By contrast, in the present matter, the DCCA became wholly financially self-sufficient in 1999, receiving no general fund monies with which to operate. The question before the court in *Southview Co-Operative*—whether monies from a fund that commingled both assessments and "intergovernmental revenues," which ostensibly were supplied by taxes, could eventually revert to a general fund—is simply not before us. We deal solely with the question whether monies from a fund made up entirely of assessments, fees, fines, penalties, and reimbursements can be transferred to a general fund.

We blanch at the State's basic contention that a user or regulatory fee, if initially assessed as such, can be transferred to a general fund when the same assessment would have been invalid had it been assessed initially with the express understanding that the funds would be transferred to the general fund. If we adopted such a position, seemingly nothing would bar the legislature from dipping into the fees collected by any state regulatory agency that were deemed to be "in excess of the requirements of the fund." *See* 2002 Haw. Sess. L. Act 178, § 40 at 793. *San Juan Cellular* speaks clearly on this score, noting that courts, in distinguishing a regulatory fee from a tax, "have tended … to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation." 967 F.2d at 685; *see also Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371, 376 (3d Cir.1978) (holding that a city-assessed charge to fire and burglar alarm companies was a "tax" because "moneys collected are added to the [general fund], rather than applied *exclusively* to contractual services owed central alarm station companies" (emphasis added)); *Bloom v. City of Fort Collins,* 784 P.2d 304, 311 (Colo.1989) (holding that provision of "transportation utility fee" ordinance that authorized city council to transfer excess revenues from fee to any other city fund "render[ed] the … fee the functional equivalent of a tax"); *Health Servs. Med. Corp. of Cent. New York v. Chassin,* 175 Misc.2d 621, 668 N.Y.S.2d 1006, 1009–10 (1998) (holding that a portion of payments mandated by statute by HMOs to hospitals that were deposited in the state's general fund represented an unconstitutional tax); *Radio Common Carriers of New York, Inc. v. New York,* 158 Misc.2d 695, 601 N.Y.S.2d 513, 515–16 (1993) (holding that a "special fee" on paging devices enacted by state was a tax because the proceeds were added to the state's general fund).

After viewing the transferred funds through the lens of *San Juan Cellular* by "emphasizing [the assessment's] ultimate use," 967 F.2d at 685, while bearing in mind our maxim that "'the nature of the tax or "charge" that a law imposes is not determined by the label given to it but by its operating incidence,'" *Medeiros,* 89 Hawai'i at 366, 973 P.2d at 741 (quoting *Stewarts' Pharmacies,* 43 Haw. at 144) (brackets omitted), for the reasons stated in the following section, we hold that the regulatory fees were transferred unlawfully, inasmuch as they were available for general purposes, as if they were derived from general tax revenues, after being transferred to the general fund. *See San Juan Cellular,* 967 F.2d at 686. The State's argument that the insurance division neither foresaw nor condoned the legislature's transfer of its monies to the general fund is unavailing, because the insurance division's conduct is not at issue here. Our focus is instead on the *legislature's* attempts via the transfer bills to lateral the transferred funds from the insurance division to the general fund. The transfer bills must be scrutinized for any violation of the separation of powers doctrine.

### 3. *Separation of powers*

■■■■ "The separation of powers doctrine is not expressly set forth in any single constitutional provision, 'but like the federal government, [Hawaii's government] is one in which the sovereign power is divided and allocated among three co-equal branches.'"

*Biscoe v. Tanaka,* 76 Hawai'i 380, 383, 878 P.2d 719, 722 (1994) (quoting *Trustees of the Office of Hawaiian Affairs v. Yamasaki,* 69 Haw. 154, 170–71, 737 P.2d 446, 456 (1987)) (brackets omitted). The doctrine provides that " 'a department . . . may not exercise powers not so constitutionally granted, which from their essential nature, do not fall within its division of governmental functions, unless such powers are properly incidental to the performance by it of its own appropriate functions.' " *Id.* (quoting *Koike v. Bd. of Water Supply,* 44 Haw. 100, 114, 352 P.2d 835, 843 (1960)). As previously stated, the Hawai'i Constitution mandates that the "[t]he taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the [counties]." Haw. Const. art. VIII, § 3; *see also McCandless,* 20 Haw. at 417 ("The power of taxation is essentially a legislative power. It cannot be delegated except to municipalities which themselves exercise subordinate legislative powers."). The executive branch is left only with the power to administer and enforce the state's tax laws, not to levy new taxes. *See* HRS § 26–10(b) (1993) ("The department [of taxation] shall administer and enforce the tax revenue laws of the State and collect all taxes and other payments payable thereunder."). Accordingly, the insurance commissioner, as an officer of the executive branch, *see* HRS §§ 26–4(5) and 431:2–101, lacks the power to tax; as discussed at length *supra,* the insurance commissioner's statutory authority is limited to the assessment of regulatory fees.

■ The legislature's promulgation of the transfer bills amounted to an impermissible blurring of the distinction between the executive power to assess regulatory fees and the legislative power to tax for general purposes. We therefore hold that the transfer bills unlawfully sought to transform $3,500,000.00 of legitimate regulatory fees into general tax revenue.[12] Courts that have addressed the issue of funds transferred from special funds

so that they could be used for more general purposes have held that the transferred funds should be returned to the special funds. *See, e.g., Daugherty v. Riley,* 1 Cal.2d 298, 34 P.2d 1005, 1011–12 (1934) (ordering that funds transferred in a legislative appropriation from a special fund to the general fund needed to be returned to the special fund); *Clark County Council v. Donahue,* 873 N.E.2d 1038, 1043 (Ind.2007) (holding that monies that the county used from a special fund, which was comprised of fees that were collected to supplement probation services, for general court expenses needed to be returned to the special fund). As such, the $3,500,000.00 that was moved into the general fund pursuant to the transfer bills must be returned to the CRF so that they may be used for the regulation or benefit of the parties upon whom the assessments were imposed. *See Bidart Bros.,* 73 F.3d at 931. Given that the amount that must be returned is readily ascertainable, we see no need for an accounting on remand.

■ In summary, the portion of the assessments paid by HIC to the insurance division that ultimately went to support the overhead of the DCCA and the DBF, along with the portion of the assessments that the insurance division applied towards creating a reserve fund, did not amount to unconstitutional taxes. On the other hand, the legislature was without the power to mandate, via the transfer bills, that the insurance division remit regulatory fees to the legislature's general fund, as if they were general tax revenues. Accordingly, the transfer bills violated the separation of powers doctrine.

**B.** *The ICA Correctly Concluded That The Assessments Did Not Violate The Equal Protection Clauses.*

■ HIC asserts that the assessments imposed pursuant to HRS § 431:2–215

---

**12.** At oral argument, the State asserted that, even if it were unconstitutional for the legislature to require that the funds from the IRF and the CRF be transferred to the general fund, HIC could not prove that the funds were those that its members had paid to the insurance commissioner. MP3: Oral Argument, Hawai'i Supreme Court, at 6:09 to 8:55 (Nov. 6, 2008), *available at* http://www.

state.hi.us/jud/oa/08/SCOA—110608—27840.mp 3. Although the State invoked this construct in the background sections of its opening brief and its application, it did not actually advance the point in the argument section of its opening brief or application. We therefore decline to address the State's argument. *See* Hawai'i Rules of Appellate Procedure Rules 28(b)(4) and (b)(7).

offend the equal protection clauses of the Hawai'i and United States Constitutions, both of which guarantee that no person shall be denied the equal protection of the laws. *See* Haw. Const. art. I, § 5; U.S. Const. amend. XIV. "[U]nless fundamental rights or suspect classifications are implicated, we will apply the rational basis standard of review in examining a denial of equal protection claim." *KNG Corp. v. Kim,* 107 Hawai'i 73, 82, 110 P.3d 397, 406 (2005) (quoting *Sandy Beach Def. Fund v. City Council,* 70 Haw. 361, 380, 773 P.2d 250, 262 (1989)) (emphasis omitted). HIC does not contend that its members' fundamental rights are implicated by HRS § 431:2–215 or that the statute draws suspect classifications.[13] Its argument is instead that the statute treats insurers differently than other similarly situated persons without a rational basis. Under the rational basis standard of review,

> "a party challenging the constitutionality of a statutory classification on equal protection grounds has the burden of showing, with convincing clarity[,] that the classification is not rationally related to the statutory purpose, or that the challenged classification does not rest upon some ground of difference having a fair and substantial relation to the object of the legislation, and is therefore not arbitrary and capricious."

*Id.* (quoting *Sandy Beach Def. Fund,* 70 Haw. at 380, 773 P.2d at 262). In the present matter, HRS § 431:2–215 permits insurers to be assessed with regulatory fees in order to "defray any administrative costs" and "costs incurred by supporting offices and divisions." HRS § 431:2–215(b). HIC basically maintains that, even if insurers benefit to some degree from the insurance division's regulations, it was arbitrary to impose a substantial[14] portion of the division's administrative costs upon insurers, because the public in general and policyholders in particular also benefitted from those regulations.

The United States Supreme Court considered a similar contention in *Mountain Timber Co. v. Washington,* 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917), in which employers advanced the argument that, because a state workers' compensation law imposed the entire cost of accident loss upon the industries in which the losses arose, the law was violative of the equal protection clause of the fourteenth amendment to the United States Constitution. *Id.* at 243, 37 S.Ct. 260. The Supreme Court explained that it was unable to discern any ground in natural justice or fundamental right that prevented the state from imposing the entire burden upon the industries that occasioned such losses. *Id.* The law was accordingly upheld. *Id.* In the present matter, the insurance commissioner has imposed a substantial portion of the administrative cost of operating the insurance division and its supporting offices and divisions upon insurers pursuant to HRS § 431:2–215. Like the losses occasioned by the employers in *Mountain Timber Co.,* 243 U.S. at 243, 37 S.Ct. 260, the insurance division's regulatory costs in the present matter were necessitated by the business of insurers. We therefore agree with the ICA that HRS § 431:2–215 does not violate the equal protection clause of the Hawai'i or United States Constitutions. *See Hawaii Insurers Council,* 117 Hawai'i at 462, 184 P.3d at 777.

C. *The ICA Correctly Concluded That The Circuit Court Was Not Divested Of Subject-matter Jurisdiction By Virtue Of HIC's Members' Failure To Exhaust Their Administrative Remedies.*

The State challenges the ICA's determination that the circuit court was not deprived of subject-matter jurisdiction by virtue of HIC's members' failure to exhaust their administrative remedies. *See id.* The requirement that a party exhaust his administrative remedies "comes into play 'where a

---

13. For a discussion of whether insurance companies are part of a suspect classification and whether the right to participate in the insurance business is a fundamental right, see *Casualty Reciprocal Exchange v. Missouri Employers Mutual Insurance Co.,* 956 S.W.2d 249, 257 (Mo. 1997).

14. The insurance commissioner did not impose all of the insurance division's costs upon insurers. Some costs were covered by other revenues that the division received.

claim is cognizable in the first instance by an administrative agency alone,' " and, in such a case, " 'judicial interference is withheld until the administrative process has run its course.' " *Aged Hawaiians v. Hawaiian Homes Comm'n,* 78 Hawai'i 192, 202 n. 18, 891 P.2d 279, 289 n. 18 (1995) (quoting *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 93, 734 P.2d 161, 168 (1987)). Yet " 'an aggrieved party need not exhaust administrative remedies where no effective remedies exist.' " *In re Interest of Doe Children,* 105 Hawai'i 38, 59, 93 P.3d 1145, 1166 (2004) (quoting *In the Interest of Doe Children,* 96 Hawai'i 272, 287 n. 20, 30 P.3d 878, 893 n. 20 (2001)).

■■■ According to the State, administrative remedies were available to HIC's members under HRS § 431:7–203(a). The statute provides in relevant part that,

> [i]f any person has paid to the [insurance] commissioner any tax, fee, or other charge in error or in excess of that which the person is lawfully obligated to pay under [the insurance] code, the commissioner, upon written request made by the person to the commissioner ..., shall authorize a refund thereof out of the [CRF], except that a tax refund shall be payable out of the general fund.

HRS § 431:7–203(a). Thus, the State appears to argue that, if HIC's members had paid taxes or fees in excess of those which they were lawfully obligated to pay under the insurance code, HRS § 431:7–203 required that they seek a refund from the commissioner. The primary reason that HIC has asserted that its members were not lawfully obligated to pay the fees imposed by the commissioner pursuant to HRS § 431:2–215 was that the fees were, in fact, unconstitutional under the separation of powers doctrine. Agencies may not, however, pass upon the constitutionality of statutes. *HOH Corp. v. Motor Vehicle Indus. Licensing Bd., Dep't*

*of Commerce & Consumer Affairs,* 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987). As such, had HIC initially brought this claim before the insurance commissioner, an administrative officer, *see* HRS §§ 26–4, 431:2–101, and 431:2–102, he would have been powerless to declare the fees that he had imposed pursuant to HRS § 431:7–203 unconstitutional or to provide a refund on that basis. *See HOH Corp.,* 69 Haw. at 141, 736 P.2d at 1275. Thus, there were no remedies for HIC's members' constitutional claim under HRS § 431:7–203. *See In re Interest of Doe Children,* 105 Hawai'i at 59, 93 P.3d at 1166. Accordingly, we agree with the ICA that the circuit court did not lack subject-matter jurisdiction by virtue of HIC's members' failure to exhaust their administrative remedies. *See Hawaii Insurers Council,* 117 Hawai'i at 462, 184 P.3d at 777.[15]

## IV. CONCLUSION

In light of the foregoing analysis, we affirm the May 5, 2008 judgment of the ICA insofar as it affirmed the February 27, 2006 judgment of the circuit court for the reason that the transfer bills were unconstitutional. Although the transfer bills did not assess unconstitutional taxes, they did offend the separation of powers doctrine because they unlawfully sought to divert legitimate regulatory fees into the general tax revenue stream. We reverse the ICA's judgment inasmuch as it affirmed the circuit court's judgment that the assessments levied to create a reserve fund and to provide overhead expenses for the DCCA and the DBF represented unconstitutional taxes. In summary, we affirm the ICA's judgment in part and reverse it in part. We remand this matter to the circuit court for further proceedings consistent with this opinion.

---

**15.** The State also argues that, if the assessments were taxes, then administrative remedies were available to HIC's members under HRS § 431:7–204.5 (1993), which provides in relevant part that "any person aggrieved by any assessment of the tax for any month or any year may appeal from the assessment in the manner and within the time and in all other respects as provided in [HRS § ]235–114." In addition, the State maintains that, if the assessments were taxes, then the ICA erred in concluding that the circuit court was not divested of jurisdiction to award declaratory or injunctive relief in light of HRS § 632–1. Because we conclude that the transfer bills did not transform legitimate regulatory fees into general tax revenues, *see supra* section III.A, we decline to address the State's arguments.